## PITTSBURGH AND LAKE ANGELINE IRON COMPANY *v.* CLEVELAND IRON MINING CO..

ERROR TO THE SUPREME COURT OF THE STATE OF MICHIGAN.

No. 260.   Argued April 24, 25, 1900. — Decided May 21, 1900.

For the reasons set forth in the opinion of the court, the case was dismissed
for want of jurisdiction.

THE case is stated in the opinion of the court.

*Mr. F. O. Clark* for plaintiff in error. *Mr. Alfred Russell*
was on his brief.

*Mr. Benton Hanchett* and *Mr. James H. Hoyt* for defendants
in error. *Mr. A. C. Dustin* and *Mr. George Hayden* were on
their briefs.

MR. JUSTICE McKENNA delivered the opinion of the court.

The plaintiff in error and the defendants in error were respectively plaintiff and defendant in the court below, and we
will so designate them.   They were riparian owners on a body
of water called Lake Angeline, in the State of Michigan, and
this suit is to determine the extent of their respective ownerships to the bed of the lake.   They all derived title through
United States patents, and the controversy is claimed by plaintiff to arise from their construction and effect.

The trial court dismissed plaintiff's bill, and its action was
affirmed by the Supreme Court of the State, 76 N. W. Rep. 395,
and this writ of error was then sued out.

A motion is made to dismiss for want of jurisdiction in this
court, on the ground that no Federal question was raised in the
state court, or, if one was raised, the decision of the state court
was rested on a question not Federal, which was sufficient to
sustain the judgment.

Under the circumstances of this case it will be more orderly

to consider the latter ground first, and its proper determination requires a consideration of the opinion of the Supreme Court, of its statement of facts (which we condense) and of its conclusions from those facts:

"Lake Angeline was situated on sections 10, 11, and 15, T. 47 N., R. 27 W., and was within the corporate limits of the city of Ishpeming, in Marquette County. It contained 148.61 acres within the government meander lines. It was a mile in length east and west, and 1690 feet in width on the centre line of section 10, which is its widest point.

\* \* \* \* \* \* \* \*

"The three parties to this litigation own all the lands surrounding this lake; the complainant owning that part of section 15 bordering upon the lake; the defendant Cleveland Iron Mining Company owning that part of sections 10 and 11 bordering on the lake east of the centre line of section 10; and the defendant Lake Superior Iron Company owning that part west of said centre line. These three mining corporations have owned this land about thirty years and have been engaged in mining upon their respective properties for more than twenty years. For the sake of brevity, these companies will be designated by their initial letters."

No ore was known to exist in the bed of the lake until the winter of 1886 and 1887, when it was discovered on territory not owned by plaintiff, but plaintiff was informed of the discovery. Afterwards ore was discovered on its territory. The extent and locality of the ore beds were not exactly known, and negotiations were entered into for pumping out the lake, and ended in a contract between the parties.

It recited the discovery of the ore and the necessity of pumping out the lake, in order to "economically mine such ore as lies under such portions of said bed as each of said parties is respectively entitled to."

It provided for the purchase of a pumping apparatus which one B. C. Howell had, and, in consideration of the "mutual considerations received each from each, the receipt of which is hereby respectively acknowledged."

The agreement then provided what proportion of the cost of

the pumping apparatus and plant should be respectively borne by the parties both for its purchase and maintenance, and the expenses of the work. And it was found by the Supreme Court that the agreement was formally executed. The acknowledgment by plaintiff recited that it was done by its president and secretary, and also that it was done on behalf of the corporation.

The total cost of draining and keeping water out of the lake until January 1, 1897, was $76,488.38. "Of this the C. I. M. Co. paid $44,149.68; the L. S. I. Co. $17,147.18; and the complainant $7801.38. The water under the southeast arm of the lake was comparatively shallow. A vast body of mud was found in the bottom of the lake, and the two defendants incurred an expense, in attempting to remove it, of $20,227.53."

"After the execution of this contract, each party worked upon its own property as defined thereby. The complainant mined out all the valuable ore under the southeast arm, and afterwards filled its opening with the waste rock. The L. S. I. made explorations at considerable expense, and the C. M. I. Co. made the five drill holes above referred to from the complainant's mine, and ran a drift through the rock underneath the lake nearly to the south line of section 10, and, after reaching ore, ran drifts and cross cuts with a view to determining the value of the ore and ascertaining if there was sufficient to open and equip a mine. All this involved large expense.

"The section line was regarded as the line dividing these properties. Nails were driven in the timbers underground to indicate the line. In 1894 complainant made an innocent trespass north of the line, for which an amicable settlement was made. In 1896 the C. I. M. Co. trespassed upon complainant's property south of the line, and amicably settled for it. Maps were frequently exchanged with each other. Complainant asked and obtained permission from the C. I. M. Co. for the construction of a railroad track north of the section line, which was constructed and has ever since been in operation by complainant. On March 21, 1894, the C. I. M. Co. executed a lease to complainant, granting it the right to use land north of the section line for stock-pit grounds and the erection of temporary

structures for mining purposes. Other acts also were done by the respective parties in recognition of the fact that the south line of section 10 was the boundary line as stated in the above agreement. This state of affairs continued until November, 1896, when complainant served a notice upon the defendants that it claimed title to certain lands north of the section line.

\* \* \* \* \* \* \* \*

" Complainant commenced mining on lots four and five in 1863. The hill was very near the shore of the lake, and complainant dumped its waste rock into the lake and filled in several acres north of the section line. Upon this made land 'north of the line it erected some buildings, the most of which it removed to the south of the line in 1887. Complainant filed its bill of complaint November 23, 1896."

Chief Justice Grant, delivering the opinion of the court, stated the theory of the plaintiff's bill to be—

" That the territory formerly covered by the waters of this lake should be divided among the shore owners in proportion to the amount of shore frontage owned by each ; that such ownership extends to the center of the lake to be equitably established by the court; and that such territory should be partitioned by convergent lines drawn from the outside limit of each frontage to a convergent point called the equitable centre. To the bill is attached a map purporting to contain such equitable division."

And after stating in what apportionment of the bed of the lake this would result, stated the claims of the defendants as follows :

" (1) The patent under which the defendant, the Cleveland Iron Mining Company, claims title gave it title to the whole east half of section ten (10) to the south line thereof, and complainant is barred from objecting to this claim because it has treated a body of water covering a portion of that territory as of no value, and joined in the draining of the water as if the land was merely swampy ground valuable only when reclaimed and made dry land.

" (2) Because it has title by adverse possession for more than fifteen (15) years.

VOL. CLXXVIII—18

" (3) Because the south section line of ten (10) was fixed as a boundary by agreement between the parties, that agreement being recognized and evidenced by the pumping contract and its written adjuncts, and was followed by continuous acts of recognition thereof and expenditures based thereon by both parties.

" (4) Because the pumping contract is an estoppel by deed against the complainant from now asserting title.

" (5) Because the complainant is estopped by matter *in pais* from asserting title to the land.

" (6) Because the complainant is estopped by its laches.

" (7) Because as a tenant of a portion of the premises in dispute complainant is estopped to deny defendant's title."

That of Lake Superior Iron Company as follows:

" 1. That there has been a practical division of the lake bed between the parties; that contracts, explorations and mining operations have been carried on on the strength of such division for many years, in which large sums of money have been expended, without any certainty at the time of such expenditures that returns would be realized by the defendants therefrom, and that, by such division and long course of construction between the parties, the complainant is estopped to claim any portion of the lake bed lying north of the section line.

" 2. That the pumping contract, executed by the several parties, under their corporate seals, and expressly providing that it shall be binding upon the successors and assigns of the several parties, making it a contract running with the land, amounts to a division of the lake bed by deed duly executed by the several parties.

" 3. That the pumping contract is so entirely based upon the division of the lake bed above mentioned, and said division forms so essential a part of the contract, that, if such division be set aside or disregarded, the contract itself must fall; that in such case, not only is the agreement to continue the drainage of the lake at an end, but either party has a right to demand that the drainage of the lake must stop and the water allowed to rise to its original level—a result which, after all that has

been done under the pumping contract, and in reliance upon it, would work great injustice to the defendants.

" 4. That if the original division of the lake be disregarded and a new division must be made, such division must be made by the middle line or thread of the lake, in accordance with the common law rule for division of the bed of fresh water streams."

Commenting on the claims the learned Chief Justice said :

" The situation is anomalous and the books present no similar case. In March, 1892, the parties entered into an agreement to extinguish the lake by pumping out the water, leaving the territory dry ground. They agreed upon an apportionment of expense substantially according to the territory within the lines of the government survey. The lake no longer exists. Nearly five years after this suit is planted upon the theory that the lake exists, and that the court must make an equitable division from a common equitable centre. All the parties, however, seem to have discussed the question as of a lake actually in existence."

The difficulties of apportionment on plaintiff's theory were stated, and the opinion proceeded as follows :

" The above statement is sufficient to show the difficulty in making an equitable apportionment, and while nothing was said during the negotiations leading up to the agreement, or in the agreement itself, in regard to the difficulty, it may have had much to do in the minds of the officers and agents of the respective parties in fixing the terms of that agreement. That contract was a deliberate settlement of the boundary line between the lands of the three companies, and was so understood. It was of the utmost importance to these parties that the boundary line be settled beyond any possible doubt. Complainant had discovered a mine on its territory, south of the line, and extending under an arm of the lake. At that time it was the only one which it was known would be benefited by the removal of the water. No ore of sufficient value to mine had been found under the lake north of the line. After the removal of the water would come extensive and very expensive explorations to determine whether there existed under the bed of the

lake ore worth mining. The contract, if valid, established the line beyond dispute.

" The first obstacle for the complainant to remove, before resorting to an equitable apportionment, is this contract, recognized as valid, and acted upon for nearly five years by all the parties. It attempts to do this by asserting that in making that contract it relied upon the case of *Clute* v. *Fisher*, 65 Mich. 48, as establishing the rule that the territory should be divided by the government lines, and that it rested upon that case as the established law until the decision of *Grand Rapids Ice & Coal Co.* v. *South Grand Rapids Ice & Coal Co.*, 102 Mich. 227, claiming that the latter overruled the former, and that in making that contract there was a mutual mistake which entitles it to the relief prayed. The former case was decided in January, 1887, and the latter in June, 1894."

The case of *Clute* v. *Fisher* was discussed, and disposing of the question raised upon the theory that plaintiff relied upon that case in its negotiations and contract with the defendant, and that all the parties so understood it, it was said :

" We will first discuss and dispose of the question raised upon the theory that complainant relied upon the decision of *Clute* v. *Fisher* as an authoritative enunciation of the law in its negotiations and contract with the defendants, and that all the parties so understood it. The following then is the situation: We find that the parties in reliance upon that case entered into a deliberate contract establishing their boundary lines and determining the amount of territory belonging to each. Complainant made the contract with knowledge that it gained territory south of the line, known to be valuable, while it surrendered territory north of the line, not then known to possess any value. All parties are chargeable with knowledge that each was to incur risks of its own, make its own expenditures upon its own land according to the agreement, and, by reason of its expenditures and improvements, would be placed in such a position that it could not be restored to its former *status quo*.

" The anticipated result came. The explorations, expenditures and improvements were made, each company making them at its own risk. It is impossible to restore the *status quo* or to

render exact justice between the parties, because the data are not in existence. It is doubtful if a result approximately correct could be reached upon an accounting. It would be impossible to determine its correctness within many thousands of dollars.

" The result of complainant's contention would be that, whenever any case has been overruled, every transaction or agreement based upon that decision may be set aside by the courts, if not barred by the statute of limitations. The agreements and settlements of parties, made with full knowledge of the facts and in reliance upon the law, ought to be as binding as the judgment of the court in a particular case. If ten other similar suits had been pending when *Clute* v. *Fisher* was decided, and judgment had been rendered in reliance upon that decision, the courts could now set them aside. The law is not so unstable as to permit such results. Judgments rendered and contracts made upon the faith of the law as enunciated in the decision of the court, in the absence of fraud or misrepresentation, must stand. When the decision is overruled, the overruling decision controls only subsequent transactions. Such is the rule recognized by the decisions and text writers."

The opinion then proceeded to say that the mistake of plaintiff was one of law, and the case was "stripped of all other circumstances. It contains no element of misrepresentation, imposition, suppression, undue influence, undue confidence, imbecility or surprise. Neither said or did anything to mislead the other. Each acted with deliberation and with complete knowledge of all the facts. The sole basis of complainant's claim is that the decision of this court, upon the faith of which the contract was made, was subsequently overruled."

And it was decided that the case did not come " within any exception to the rule that a mistake of law does not furnish any ground for relief."

It was then considered if the contract settling the boundary line and acquiescence therein and the acts done thereunder estopped plaintiff from asserting a different line, and it was held that it did against the claim that the statute of frauds prevented estoppel — against the claim that a corporation could not settle

a boundary line without a meeting and vote of its stockholders. "The contract was the act of the three parties to it," the court said,

"It was introduced by the complainant as a valid contract. It was executed with all the formalities of a deed. It had the seal of the corporation. Complainant, as well as the defendants, paid out large sums of money under it. All are now estopped to deny its due execution and validity.

\*   \*   \*   \*   \*   \*   \*   \*

"Complainant is entirely without equity. It doubted the correctness of the rule of *Clute* v. *Fisher*, and thought that a different rule might sometime prevail. It was then its duty to take steps to test the question before permitting defendants to enter into a contract and explorations involving over $100,000. It should at least have informed the defendants of its claims, and given them the opportunity to make a contract with that in view.

"This claim would not have been heard of unless the C. I. M. Co. had developed a valuable mine. The fact that the venture proved successful after large expenditure creates no equity for this complainant. The skill, energy and money of that company developed a valuable property. It ought in justice to reap the benefit, and the complainant ought to be estopped to participate in the benefit, unless an unbending rule of law prevents. *Twin Lick Oil Co.* v. *Marbury*, 91 U. S. 592; *Clegg* v. *Edmondson*, 8 De G. M. &. G. 787.

"It would not have offered to bear its share of the loss if unsuccessful, nor could it have been compelled to.

"Furthermore, it was guilty of laches in keeping silence when it ought to have spoken. Everyone is presumed to know the law. Therefore, it must be presumed to have known of the law enunciated in *Grand Rapids Ice & Coal Co.* v. *South Grand Rapids Ice & Coal Co.* It had an able attorney, who keeps well versed in the decisions of the courts of this State. Yet it waited two years and a half before asserting its claim, and still nine months after obtaining the opinion of its attorney that *Clute* v. *Fisher* was no longer the law. It waited until

circumstances and conditions have so changed that it is impossible to restore the *status quo*."

It is manifest that the Supreme Court rested its decision on the grounds (1) that the pumping contract was a settlement of boundaries between the contestants; (2) that what was done and expended under it worked an estoppel against the plaintiff; (3) laches of the plaintiff, in asserting its claim whereby the *status quo* could not be restored.

It requires no argument to demonstrate that neither of these grounds involves a Federal question. But plaintiff in error contends that they were all made to depend upon a Federal question, which the court erroneously decided, and therefore that they necessarily involve such question.

It is claimed to arise under conflicting claims under United States patents. "This," counsel for plaintiffs say, "presents the *fundamental Federal* questions [the italics are counsel's] involved in this case, viz.: Did the complainant acquire title to the centre of the lake by virtue of its ownership of said government lots 2, 3, 4 and 5; or did defendants obtain title by virtue of their several patents, to a point where the south line of section 10, if projected east and west through the water of the lake, would run?" And this asserted Federal question is said to have been decided by the Supreme Court of Michigan in the following language of its opinion: "The Cleveland Iron Mining Co. claimed title by virtue of the original patent. Complainant owned no specific piece of land north of the section line, even under its own theory, which could be measured by metes and bounds. How much, if any, it owned could only be determined by agreement or the decree of a court of equity."

What this language means we do not think the opinion of the court leaves in doubt. But whether plaintiff did or did not own land of section 10 which could be or could not be measured by metes and bounds; whatever its rights and the rights of the other parties were, they could be settled by agreement, and could be made the foundation of business transactions and enterprises. The Supreme Court determined they were so made and could be so made under the laws of Michigan.

But again, and whatever the error in that conclusion, (we do

not assert there was any,) the court decided, as an independent ground of estoppel, that plaintiff was guilty of laches, and that was sufficient to sustain its judgment.

*The case must, therefore, be dismissed for want of jurisdiction, and it is so ordered.*