ORVILLE EBLEN,

*Plaintiff and Appellant,*

vs.

IMO EBLEN, Individually, IMO EBLEN, Executrix of the Estate of Frank Eblen deceased; L. M. YORK, Individually; L. M. YORK, agent and attorney for Imo Eblen, Executrix; EBLEN INCORPORATED, a Wyoming Corporation; THOMAS W. EBLEN; GALLOWAY & SMITH, A Co-Partnership consisting of C. E. Galloway, C. A. Galloway and Roy H. Smith; COOPERATIVE REFINING ASSOCIATION, a foreign corporation doing business in Weston County, Wyoming, GRACO OIL & REFINING COMPANY, a Wyoming Corporation,

*Defendants and Respondents.*

(NO. 2492; July 24, 1951; 234 Pac. (2d) 434).

For the plaintiff and appellant the cause was submitted upon the brief of McAvoy & Lowe, Newcastle, Wyoming; Dalton & Dalton, Atlantic, Iowa; and Richards & Richards of Red Oak, Iowa, and oral argument by Jonathan B. Richards and George C. Dalton.

For the defendants and respondents the cause was submitted upon the brief and also oral argument of Thomas O. Miller of Lusk, Wyoming.

356

## OPINION

RINER, Justice.

This is a direct appeal proceeding to procure a review by this court of a judgment of the district court of Weston County adverse to the plaintiff and appellant, Orville Eblen. The action was commenced December 15, 1948, in the court above mentioned, against Imo Eblen individually, Imo Eblen Executrix of the Estate of Frank Eblen, deceased, L. M. York individually, L. M. York agent and attorney for Imo Eblen, executrix; Eblen Incorporated, A Wyoming Corporation; Thomas W. Eblen; Galloway & Smith—a co-partnership consisting of C. E. Galloway, C. A. Galloway and Roy H. Smith; Cooperative Refining Association, a for-

eign corporation doing business in said county; and Graco Oil & Refining Co., a Wyoming corporation.

Answers to plaintiff's petition were thereafter filed by the Graco Oil & Refining Co.; Imo Eblen individually and also as executrix of the estate of Frank Eblen deceased; Thomas W. Eblen and Eblen Incorporated. General demurrers to plaintiff's petition were interposed by L. M. York individually, L. M. York agent and attorney for Imo Eblen as executrix; Galloway & Smith, a co-partnership consisting of the persons named above. Prior to filing their answers as stated above Imo Eblen individually, Imo Eblen as executrix of the estate of Frank Eblen deceased; Eblen Incorporated, and Thomas W. Eblen also filed general demurrers to plaintiff's pleading aforesaid.

Thereafter by stipulation of the parties the rights of the defendants, the Cooperative Refining Association, Graco Oil & Refining Co., and Galloway & Smith, a co-partnership who were respectively the refineries purchasing the oil produced from the leases in controversy and the drillers of the wells on said leases were determined and agreed upon, and said stipulation was subsequently duly approved by an order of the district court aforesaid and these three last named defendants were "relieved from filing any further pleadings herein but shall furnish upon request of and to the parties hereto such information as shall be within their knowledge relative to operations on said leases and relative to oil purchased by either of said refining companies at any time in the past or in the future from the lands above described." The demurrer of these parties do not otherwise seem to have been ruled upon.

The demurrers of the remaining parties were duly presented to the District Court and overruled except the demurrer of L. M. York individually and L. M.

York as agent and attorney for Imo Eblen executrix as aforesaid, which was sustained, and said defendant L. M. York, either as agent or individually, appears no longer as a party of this litigation. The court order last mentioned also allowed the defendants whose demurrers were thus overruled time to file their several answers to plaintiff's petition and plaintiff time to file replies to these answers was allowed and fixed. Pursuant to this order the answers and replies above referred to were duly filed and the issues to be determined were framed.

These pleadings are altogether too long and involved to set forth in this opinion a statement of their contents. It will be sufficient to say that plaintiff's petition sought by its allegations to claim a joint adventure between plaintiff and defendants Thomas W. Eblen and one Frank Eblen, Sr., now deceased, to purchase, hold and develop in equal shares and interests certain oil and gas leases upon the lands hereinafter described in Weston County, Wyoming; and that plaintiff at the time of filing his petition "retains his full interest therein"; and to claim also that Imo Eblen individually and as executrix of the estate of Frank Eblen, deceased, and the defendant Eblen Incorporated her grantee have no interest in said joint adventure or the existing or future assets thereof in excess of the undivided one third ($\frac{1}{3}$) interest therein of which her husband Frank Eblen, Sr. as joint adventurer died seized; and also to claim that the assets of said adventure include certain oil and gas leases in said petition described embracing the lands described as follows, to-wit:

"The Southeast Quarter of Section 24, the Northeast Quarter of Section 24, and the Northeast Quarter of Section 14, all in Township 44, Range 63, Weston County, Wyoming,"

and asserting that the plaintiff, Orville Eblen as the

owner of an undivided one third interest therein is entitled to an accounting from the defendants, Imo Eblen individually and as executrix of the estate of Frank Eblen deceased, Eblen Incorporated and Thomas W. Eblen. The answers filed on behalf of the parties defendant above named were for the most part similar in character and except as set forth in said answers denied each and every allegation in plaintiff's petition except such as were in said answers admitted. The following excerpt from the answer of Thomas W. Eblen, one of the sons of Frank Eblen, Sr., may be regarded as supplying the allegations which in large measure produced the issues of fact subsequently herein described and which were the controversial problems in the case to be determined by the trier of facts herein. That excerpt reads:

"This answering defendant admits that about the month of December, 1942, his father, who is now deceased, purchased some 136 shares or interests in the Western Oil & Gas Trust, having a par value of $25.00 per share, for the sum of Thirty-four Hundred Dollars ($3,400.00), and paid for the same. Likewise this answering defendant purchased forty (40) shares or interests in said Western Oil and Gas Trust having a par value of $25.00 per share and having paid for the same. "This answering defendant further states that his father, Frank Eblen, on or about May 3, 1943, also purchased an oil and gas lease covering the lands described in paragraph one of Plaintiff's petition but that neither the said Plaintiff, Orville Eblen, nor this defendant, had any interest therein at the time mentioned in plaintiff's petition; that the instrument conveying said lease was on May 3, 1943 duly recorded in the office of the County Clerk and Ex-officio Register of Deeds of Weston County, Wyoming, in Book 21, Page 393, in which said instrument the Western Oil and Gas Trust, H. O. Beadle, Trustee, covenanted that assignor was the lawful owner of and had good title to the property assigned and that the same was free and clear from all liens, encumbrances or adverse claims; that said lease was

valid and subsisting and that all conditions necessary to keep the same in full force had been duly performed."

The answers also each pleaded that:

"Due to the laches of the plaintiff and the changed conditions of the parties hereto it would be inequitable, even if plaintiff had made an agreement of joint adventure as he alleges and which this answering defendant denies, to grant the relief prayed for by Plaintiff."

These pleadings resulted in the framing of certain issues of fact to be tried by the district court of Weston County, viz: (a) whether a joint adventure as claimed in plaintiff's petition was ever created by the plaintiff, the defendants Thomas Eblen and Frank Eblen prior to the latter's death which occurred June 26, 1947; (b) whether if such a joint adventure had been created as claimed by the plaintiff this alleged relationship had been terminated prior to Frank Eblen's death and (c) whether if plaintiff did have a joint adventure interest in the leases to the property aforesaid, as he claims, he was nevertheless barred by his laches from asserting any interest in said leases.

The disposition of the first of these issues by a negative answer thereto or an affirmative answer to either of the remaining two, will necessarily result in an affirmance of the judgment of the trial court. The trial of the case began September 23rd, 1949 and was concluded on September 26th, 1949 being heard by the district court of Weston County sitting without a jury. That judgment omitting recitals as to appearance of counsel and their readiness for trial reads as follows:

"The court proceeded to hear the testimony of the parties and their witnesses, both oral and documentary and both parties having rested and the court having heard the arguments pro and con and having ordered that each party submit written briefs, which briefs have been submitted to and considered by the court, and now

the court having considered all of the evidence and the law finds that the plaintiff has failed to sustain his burden of proof in this action and finds generally in favor of the defendants and against the plaintiffs.

"IT IS THEREFORE HEREBY CONSIDERED, ORDERED, ADJUDGED AND DECREED, that the plaintiff take nothing by reason of his action against the defendants and that the same, be, and hereby is, dismissed; that defendants have their costs herein expended and taxed in the sum of $31.90.

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all sums of money held by the Clerk of this court on deposit from the sale of oil from the premises involved in this action, be released and paid to the parties in the proportions shown in the stipulations and orders heretofore filed herein."

An exception to the judgment thus rendered was appended thereto. This judgment was rendered March 3rd, 1950 and duly entered on the court's journal on March 6th, 1950.

It will be observed that the trial court made a general finding in favor of the defendants and against the plaintiff.

As to the inception and existence of the alleged joint adventure the plaintiff in his brief in this court concedes that the record presents a "sharp difference between the position of the plaintiff and that taken by the defendants." And, says the plaintiff, "the evidence of the plaintiff is over-whelmingly persuasive and the position of the defendants is contradictory and unworthy of belief." Yet, plaintiff also concedes in his written argument submitted to the court relative to a joint adventure:

"Where the existence of the relationship is in issue, and there is substantial evidence tending to prove that the parties intended to join their efforts in furtherance of

the enterprise for their joint profit, the question is pre-eminently one for the jury."

In other words in the case at bar the question whether there was or was not a joint adventure proven herein was "pre-eminently one for" the presiding judge, the trier of the issues of fact submitted. Where the evidence in a cause is conflicting on crucial issues of fact and one of the parties comes here with a general finding against him upon substantial evidence by the trial judge who saw and heard the witnesses, as produced by the parties, it is an unusual case—as this court has so often reminded counsel—where it becomes the duty of this court to interfere. The judgment must be "clearly erroneous or against the great weight of the evidence" to warrant our laying aside a rule which has prevailed in our appellate practice since Statehood was granted this commonwealth.

We realize that in their examination of a record, urged by an impelling zeal for their clients' interests, counsel for the losing party are prone to overlook that the mind of a trial judge who has the superior advantage over us as suggested in the excerpt taken from the Edwards case infra, may properly take an altogether different view of the testimony of witnesses who come before him in the course of a trial. So we must again remind counsel that as in Edwards vs. Willson et al, 30 Wyo. 275 at 278; 219 P. 233 this court has said:

"The rule followed by this court in actions at law where there is conflicting testimony is well known and it is not necessary to cite the cases. And the same rule has been applied in equity cases. Conway vs. Smith Mercantile Co., 6 Wyo. 468; 46 Pac. 1084; Patterson vs. Hardware Co., 7 Wyo. 401, 52 Pac. 1085; Columbia Min. Co. vs. Duchess Min. Co. 13 Wyo. 244, 79 Pac. 385; Phelan vs. Cheyenne Brick Co., 26 Wyo. 495, 188 Pac. 354; 189 Pac. 1103; McFadden vs. French, (Wyo.) 213 Pac. 760.

The rule, with its reasons, is stated in Conway vs. Smith Merc. Co., supra, as follows:

'The question is whether there is sufficient evidence to sustain these findings. It is not whether this court from the written report of the evidence, would so find. The trial court had most of the principal witnesses before it, giving that court the better opportunity to judge of their character and credibility.' "

Plaintiff appears not to realize, also, that it has been indicated many times by this court that it is not "our function to pass upon the credibility of witnesses." Corson vs. Wilson 56 Wyo. 218 at 255; 108 P. (2d) 260 and cases cited. This must be so for we have nothing but the cold typed record before us and do not see the demeanor of living witnesses, the transcript of whose testimony ultimately produces a part of that record, as does the jury or trial judge sitting to dispose of questions of fact.

Where the assignments of error are as set forth in the case at bar viz.: that the judgment is "not sustained by sufficient evidence," "contrary to the evidence" and "contrary to law" we have many times ruled that:

"It must be borne in mind that the appellate court must assume that the evidence in favor of the successful party is true, leave out of consideration entirely the evidence of the unsuccessful party in conflict therewith, and give to the evidence of the successful party every favorable inference which may be reasonably and fairly drawn from it." (Jacoby vs. The Town of the City of Gillette, 62 Wyo. 487; 174 Pac. 2d 505).

See also other Wyoming cases cited subsequent to the excerpts last above made where the quoted rule was applied as we are obliged to apply it here.

Relative to the consequences flowing from a general finding of the trial court when that appears in a judgment under review in this court it was stated also in the Jacoby case above cited that:

"The appellants come here with a general finding of the trial court against them. Concerning the effect to be given such a finding this court has said in Hinton vs. Saul 37 Wyo. 78, 259 Pac. 185 at 191 that:

'And in causes tried to a court, a general finding is one of the every special thing necessary to be found to sustain the judgment.'

"And in Wallis vs. Nauman 61 Wyo. 231; 157 Pac. (2d) 285 it was pointed out that in Knaggs vs. Mastin, 9 Kan. 532, 533 the Supreme Court of Kansas, in an opinion assented to by Mr. Justice Brewer, said:

'Where the facts are established by a general finding of a court, it must always be presumed that all the controverted facts are established in favor of the party for whom the court finds, and against the party against whom the court finds."

With these rules before us we proceed to examine briefly some of the testimony for the defendants.

Thomas Eblen as a witness for the defendants testified in part that he is related to Frank Eblen, Sr., now deceased, being his son. That he knows Imo Eblen, who is his mother; that he knows also Frank Eblen, Jr., who is his brother; he also knows Orville Eblen, the plaintiff in this case, who is his cousin; that he has known the latter as long as he can remember * * * After testifying that a Mr. Beadle as trustee of a business organization known as The Western Oil & Gas Trust which was formed to complete an old oil well which a group of residents of the town of Atlantic, Iowa, had started prior to the formation of this trust, this well being located on the northeast quarter (NE¼) of the southwest (SW¼) of section 24 Township 44 range 63 in Weston County, Wyoming, was then making a report to persons interested and attending a meeting in the Supervisor's room of the Cass County, Iowa, Court House, concerning the progress of this well drilling, continued his testimony thus: He went with Or-

ville Eblen on or about December 8th, 1942 to the Cass County House in Atlantic, Iowa. At that time Tom was living in Cumberland, Iowa, and in his father's home. Orville Eblen was then living in Cumberland on a farm south of town. Tom, his father, Frank Eblen, Sr., and Orville took his (Tom's) father's car for this trip leaving Cumberland about 7:30 or 7:45 in the evening. Neither Ted Wilkenson nor John Black were with them on this trip. They went to Cass County court house parking lot and then proceeded to the court house and entered the supervisor's room, whose desk was in the northeast corner of that room, at about 8:15 p.m. At the time these parties entered that room, the meeting had commenced and Mr. Beadle was making the report above mentioned and the three men, Orville, Tom and Frank Eblen, Sr., waited at the doorway until Beadle had completed his report. The latter was reporting on the financial condition of the Trust and the progress of the well which was having trouble in consequence of having to by-pass some well casing which had collapsed in the hole. Beadle gave information on the tremendous cost of going ahead with this well since that trouble had arisen. Orville Eblen sat in the back of the room. As Beadle sat down after making his report Tom's father, Frank, Sr., stepped forward and asked Beadle if he could see him personally. Tom had meanwhile never left the doorway and his father did not sit down at all. Tom's father, Frank, Sr., Tom himself and Howard Beadle went out into the adjoining hallway and stayed there a short time. Mr. Beadle stated then that he was discouraged, that he had fought this matter out at Newcastle, Wyoming, with very little help; that it was difficult to raise money and he did not have any source of any other money; that his friends and he had gone as far as they could go and unless they found some new source of money or some way to raise more money they would have to stop drilling.

Tom then testified that Mr. Beadle thereupon offered Tom's father, Frank, Sr., that if the latter would put some of his own money in or arrange for some money he (Beadle) would give *him* (Frank, Sr.,) some acreage. To this offer Frank Eblen, Sr., responded: "Howard I will see you through on this drilling of this well" that he (Tom's) father stated that he had made some money in Alaska and was in a financial position to see Beadle through on this well but if he (Frank Eblen, Sr.,) did invest in this well and did provide the money, he wanted some acreage of his (Frank's) own choice. No acreage was described in that conversation. Beadle replied to this: "Frank, if you will arrange for some money and put your own money into this well in Wyoming I (Beadle) will personally see that *you* (Frank, Sr.,) will receive 40 acres for each 1,000 dollars that is put into the Company and you can pick it." Tom's father then said: "Howard, I think that deal is a good deal and I (Frank Eblen, Sr.,) will see you through to the completion of the well;" then these three folks who were in the hallway, Frank Eblen, Sr., Howard Beadle and Thomas Eblen, went back into the supervisor's room. Beadle went back of the supervisor's desk. Tom and his father stood in the doorway. Beadle then announced that "I have made arrangements for some money with *Frank Eblen, Sr.*, to carry on our drilling operations." After that nothing was said by Tom's father, Orville Eblen or Tom. Nothing further was discussed. These three parties left for home about five minutes after this announcement was made and arrived there about 9:15 p.m. Orville did not return to Tom's father's home at that time but went on to his own home. * * * In October, 1948 while sitting in the dining room at Orville's house, Orville asked Tom if he, Tom, had not had a good streak of luck in the oil business in Wyoming and Tom replied to him that: "We had a very nice producing well that was just completed by Gallo-

way & Smith of Wichita Falls, Texas, and that they had advanced the money to buy casing and materials necessary for the completion of this well and that we were several thousand dollars in debt to them. The deal we had with them at that time was that they were to recover our costs and our net share of the production (of oil) produced on the property and that we were several thousand dollars in debt to them and it looked like in a year or so that the production might pay off our indebtedness and if we had an equal amount of luck in any future drilling operations that some day it would make them a nice income from five to twenty years." Orville said: "I am very happy to hear that because I own one third of that well." Tom then told Orville "If you own one third of that well, why didn't you come to me and make a claim in the estate or something so that we could go out there and so I wouldn't have had to spend all of my money in travelling expenses and to arrange for the contracts with the operators and settling with Pfeiler and McGuckin and other necessary expenses." Then Tom asked Orville as to where the acreage was that he claimed. To this Orville answered that: "he could not describe it but he knew the 40 acres where that well was was part his." Tom further testified that Orville "started out to say that it was a third his and then ended up by saying that the 40 acres was all his." Tom told Orville then that if he, Orville, could give Tom a "description of the well or could furnish something in the line of proof or something where he had it or why he hadn't made his claim," and "that now was a poor time to do that after 'we' had gone into this thing and why didn't he come in before." Orville claimed that the Western Oil & Gas Trust was supposed to have given the acreage to him. Orville said to Tom: "You have a 40 acres coming too, let us go down and get it." To this Tom replied: "I told him I did not know of any 40 acres I had coming to me, that I had

been out here inquiring about the properties in Wyoming for the purpose of information for the estate;" and that he, Tom, had talked to Dr. Barnett and Charles W. Smith inquiring about the holdings of Frank Eblen, Sr., and they told Tom as best they could so that I was satisfied that that was Frank Eblen's holdings and I took that information back to Atlantic, Iowa. Subsequently, at Frank, Sr.'s, home in Atlantic, Orville came and said to Tom: "What are you going to do about that 40 acres out there where the well is?" To this question Tom replied: "Orville, that 40 acres doesn't belong to you and you have no right to it and that is all there is to it." Orville then said: "I am going to get it from somebody; I am going to sue somebody; I am going to get 40 acres out there or know the reason why." * * * Tom stated that he knew the location of the original Millhouse No. 1 well which is in the northeast quarter (NE¼) of the southwest quarter (SW¼) of Section 24 Township 44, range 63. The Millhouse No. 2 well is located in the centre location on the northwest quarter (NW¼) of the southeast quarter (SE¼) of section 24, Township 44, range 63. The Millhouse No. 2 was completed by Galloway & Smith and was one of the two wells now producing oil on Section 24, Township 44, Range 63. Tom further testified that in the latter part of 1942 he did not buy any interest in the Western Oil & Gas Trust. That he owned 40 Trust certificates in the Western Oil & Gas Trust; that he does not recall ever paying for these certificates. Other than the lands involved in this action Tom's father had some other lands in the Mush Creek Field in Weston County, Wyoming. On re-direct examination Tom Eblen stated that his estimate as to what it had cost the estate of Frank Eblen, deceased, and Eblen Incorporated as expenses in connection with this Millhouse lease other than what was paid out by them to Galloway & Smith, the oil well

contractors, that that sum would be as an estimate from $18,000 to $20,000.

L. M. York testifying for the defendants stated in part that he had worked for Frank Eblen, Sr., drew checks on his account and that Frank Eblen, Sr., spent from the time witness knew him, on the Millhouse properties approximately $25,000 other than on the No. 1 well on the northeast quarter (NE¼) of the southwest quarter (SW¼) of section 24, Township 44, range 63. In the drilling of that well Frank Eblen, Sr., paid for that. He had a personal account in the First State Bank and witness York could sign checks on it for whatever money witness needed for the completion of the well. This witness handled the money for Frank Eblen, Sr., for the expenditures made on the Millhouse well; that witness York tried to buy an automobile from Orville Eblen offering him part cash and part interest in an oil lease at that time, the latter part of 1943 in Cumberland, Iowa. The acreage offered in trade was about 400 acres leasehold in section 13 Township 44 Range 62. Orville stated he could not afford to take it in on the deal at one time; that he did not have any leases up there (in Wyoming) and really didn't want any.

Frank Eblen, Jr., as a witness for defendants gave among other testimony the statement that after the Millhouse No. 1 well came in Orville stated at a party at Frank Eblen Sr.'s, farm that Frank, Sr., asked Orville to tell the people present just what there was in Wyoming. That Orville then said: "Not only has Frank Eblen the largest sharehold in Western Oil & Gas Trust but he owns all the land around this Millhouse No. 1 well and that land was north and south of this well. That Orville then described the land as laying on a ridge with a valley on both sides and that Tom's father had acquired that land. Orville asked Tom how good this Millhouse No. 1 well was. The latter replied that

it looked to be very good. Tom then said that in a few years' time we should have everything paid off and that with future success we should have a good income for maybe 5 to 15 years. That Tom stated by the use of the word "We" he implied the shareholders in Eblen Incorporated, who were L. M. York, Imo Eblen, Tom and Frank Eblen, Jr. Orville then asked Tom if he remembered any deal by which he, Orville, was to receive 40 acres of the Millhouse land. Tom said that he didn't remember any such transaction or deal. Orville claimed to Tom that he owned a third of the Millhouse No. 1 well. Tom stated at the time "That is news to me." Thereupon Orville said: "I own that 40 acres there or I have 40 acres out there and I ought to have a third of that well because I've got 40 acres out there." That the Western Oil & Gas Trust was supposed to have given it to Orville through Howard Beadle. Tom inquired if Orville got it and he said "no" and then asked the question "Did you get yours?" and Tom said "no". Frank, Jr., told Orville that as long as he had been around him and Frank's father, Frank, Sr., that if ever it had been spoken that Orville owned any part of the Millhouse well he, Frank, Jr., would certainly have remembered it. That he did not remember it because it actually had never happened.

We deem it unnecessary to review more of the testimony herein which can be mentioned as supporting the trial court's judgment. That this evidence was substantial in character there can be little doubt and it tends to establish that so far as the oil well for which funds were so badly needed at the time of the meeting in the Cass County Court House on December 8, 1942, Frank Eblen, Sr., kept his word and saw Beadle "through on the drilling end of this well."

No one can disinterestedly read the record in this case and not reach the conclusion, as it seems to us,

that Frank Eblen, Sr., was the one who either supplied the money or who through the wealth of his own experience in developing oil properties arranged for the contracts which resulted in making valuable the oil properties included in the acreage he obtained from Beadle on December 8, 1942. Tom Eblen's testimony certainly confirms the view that Frank Eblen, Sr., and no one else dealt with the former as to purchasing the acreage in dispute in this case. It was Frank Eblen, Sr.'s, money that not only completed the well which was in such serious trouble on December 8, 1942, but it was his money and experience in this type of business that produced the successful result in which the plaintiff now seeks to share.

There is evidence herein that plaintiff invested some money in shares in the Western Oil & Gas Trust at the time of that meeting but that, if true, hardly created a joint adventure between him, Frank Eblen, Sr., and Tom Eblen in the oil land leasehold involved herein.

As heretofore pointed out the testimony in the case is sharply conflicting as to what occurred at the meeting in the hallway of the Cass County court house and what was said at that time and what was done or said thereafter. However, it was "pre-eminently" the duty of the trial judge to determine the credibility of these witnesses. He was authorized to believe the testimony of Tom Eblen—as he evidently did—and to reject the testimony of the plaintiff regarding that Cass County court house meeting. Under the rules mentioned above we can hardly interfere though we felt we might have reached a different conclusion than did the trial judge.

A joint adventure, as this court has previously pointed out, "partakes of the nature of a partnership and is governed substantially by the same rules of law" the principal distinction being that a joint adventure usually relates to a single transaction although it may

comprehend a business to be continued over several years. 30 Am. Jur. 679 section 5. Wyoming-Indiana Oil & Gas Co. vs. Weston et al 43 Wyo. 526, 7 Pac. (2d) 206 and cases cited. 48 C.J.S. 809 section 2 states that:

"As a general rule, in order to constitute a joint adventure there must be an agreement to enter into an undertaking in the objects or purposes of which the parties to the agreement have a community of interest and a common purpose in its performance."

The same text at page 827 section 5 also says that:

"As in a partnership, in respect of their mutual rights and liabilities, each member of a joint adventure has the dual status of principal for himself and agent for his associates, within the scope of the enterprise."

We fail to find in the evidence herein as recited above any testimony that would lead us to think that the judgment rendered in the district court should be regarded as clearly erroneous when it is viewed in the light of the transcript of the evidence as hereinbefore set forth.

On the question of laches it may be observed that if the plaintiff believed that he had in December, 1942 acquired an interest in this property it is difficult to see why he did not take promptly all necessary steps to inform himself as to what was being done with the property in which he claimed an interest thereafter. Very slight inquiry would have advised him of the full situation. There is no testimony in this record that plaintiff ever set on foot any definite positive inquiry concerning the matter or that upon inquiry made of Frank Eblen, Sr., the latter refused to tell him, Orville, or deceived him as to what was being done in the development of this land. The assignment of the lease to Frank Eblen, Sr., was recorded May 3, 1943 in Weston County and disclosed that Western Oil & Gas Trust and H. O. Beadle, trustee, had assigned a lease on 280 acres in which he, the plaintiff, subsequently claimed to

Frank Eblen, Jr., he had an interest. The Weston County records relative to the lands involved herein disclosed that Frank Eblen, Sr., dealt with these lands as his own—making sundry transfers of them to others who held prior rights that had been overlooked. These transfers were made in order to insure safety in going on with their development. Plaintiff admitted on cross-examination that he never paid out any money for the development of these properties covered by the Millhouse lease. The Millhouse oil well No. 1 appears to have been completed about November or Christmas time 1943. Drilling operations were evidently in progress upon this well several months prior to that time. These facts plaintiff knew for he testified that he attended a party, evidently held for the purpose of celebrating the event at Frank Eblen, Sr.'s, home in 1943 after the No. 1 well had come in. Yet, plaintiff also stated that he did not know there was any drilling being done on the Millhouse lease and that he first learned of it in 1948 before he signed the petition in this case. From the situation of the matter thus disclosed the trial court would be warranted in concluding that plaintiff as a matter of fact had knowledge of what was being done under the Millhouse lease. Drilling operations are not and cannot be done secretly. Yet for some five or six years he did nothing to assert his claimed rights in this property. It is true that now he offers to pay "his share" of the cost of development of these lands. That hardly satisfies the equities of the situation. The risk in this matter is all over at this time. The Millhouse lease properties have been proven valuable as oil lease territory. Plaintiff evidently stood by and allowed Frank Eblen, Sr., and these defendants to spend thousands of dollars in the development of these lands and to assume obligations therefor, and now plaintiff undertakes to claim the property or an interest in it.

It is suggested that he was never asked to contribute to this development, but in Williams vs. Woodruff 35 Colo. 28, 85 Pac. 90 where the facts were somewhat analogous to those appearing in the case at bar the Supreme Court of Colorado said: (at page 98) :

"But it is said that it was the duty of the defendant to inform the plaintiff that there was nothing for her, and that, having failed to inform her now he was dealing with the property, he is guilty of having concealed it from her. This is not the law as we understand it. It was her business to inquire as to what had become of this property. Slight inquiry would have informed her as to the full situation. 'Concealment by silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry.' "

It is well known that it is in the interest of society that claims against the individuals thereof should be promptly prosecuted. Accordingly in law statutes of limitation have been set up arbitrary in their operation. In equity we have the doctrine of laches which is not inflexible but founded on what may be regarded as making for a just result. Mr. Pomeroy in 4 Pomeroy's Equity Jurisprudence, (4th Ed.) 3422, section 1442, discussing this matter remarks:

"The language of an able western court in a very recent case describes the general doctrine with notable accuracy: 'Several conditions may combine to render a claim or demand stale in equity. If by the laches and delay of the complainant it has become doubtful whether adverse parties can command the evidence necessary to a fair presentation of the case on their part, or if it appears that they have been deprived of any such advantages they might have had if the claim had been seasonably insisted upon, or before it became antiquated, or if they be subjected to any hardship that might have been avoided by reasonably prompt proceedings, a court of equity will not interfere to give relief, but will remain passive; and this although the full time may not have elapsed which would be required to bar a remedy at law. * * * ' "

In Abraham vs. Ordway 158 U. S. 416; 15 S. Ct. 894; 39 L. Ed. 1036 Mr. Justice Harlan speaking for the court said:

"Whether equity will interfere in cases of this character must depend upon the special circumstances of each case. Sometimes the courts act in obedience to statutes of limitations; sometimes in analogy to them. But it is now well settled that, independently of any limitation prescribed for the guidance of courts of law, equity may, in the exercise of its own inherent powers, refuse relief where it is sought after undue and unexplained delay, and when injustice would be done, in the particular case, by granting the relief asked."

So Mr. Justice Brown in Felix vs. Patrick 145 U. S. 317; 12 S. Ct. 862; 36 L. Ed. 719 had previously more elaborately considered the doctrine of laches thus:

"There is, it is true, an averment that Patrick never informed the said Sophia or her husband that he had located such scrip, but, on the contrary, fraudulently concealed the same, and exercised every precaution to prevent such proceedings coming to the knowledge of the party. But no acts of his in this connection are averred in the bill, and we are left to infer that his concealment was that of mere silence, which is not enough. Wood vs. Carpenter, 101 U. S. 135, 143 (25: 807, 809): Boyd vs. Boyd, 27 Ind. 429; Wayne vs. Cornelison, 52 Ind. 312. Indeed, his concealment is to a certain extent negatived by the fact that he put the power of attorney and deed upon record, in the proper county, shortly after their execution. It was held by this court in Badger vs. Badger, 69 U. S. 2 Wall, 94 (17: 838), in speaking of the excuses for laches, that 'the party who makes such appeal should set forth in his bill, specifically, what were the impediments to the earlier prosecution of his claim; how he came to be so long ignorant of his rights, and the means used by the respondent to fraudulently keep him in ignorance; and how, and when, he first came to a knowledge of the matters alleged in his bill; otherwise the chancellor may justly refuse to consider his case, upon his own showing, without inquiring whether there is a demurrer or formal

plea of the Statute of Limitations contained in the answer."

And in the case of Taylor vs. Salt Creek Consol. Oil Co. et al 285 Federal 532, a decision by the then Eighth Circuit Court of Appeals, Judge Kenyon who wrote the opinion discussed the doctrine of laches as applied to oil land property in Wyoming. This suit was originally instituted in the State Court and was removed to the U. S. District Court for the District Court of Wyoming. It was a suit brought to impress a trust upon an oil lease obtained from the U. S. Government under the then recently enacted Leasing Act passed by Congress. The litigation presented a situation where one of three persons alleged to have been engaged in a mining partnership adventure in certain oil lands had been, as it was alleged, excluded by the others from participating in the profits of the venture. As here, the excluded party, as he claimed, sought by suit to gain an interest in the property. The bill of complaint was dismissed on motion by defendants. Affirming the dismissal decree Judge Kenyon wrote in part:

"In Jackson vs. Jackson, 175 Fed. 710, 719, 99 C.C.A. 286, 295, it is said:

'Every case depends on its own circumstances in determining the lapse of time essential to make applicable the doctrine of laches. It will be applied in cases where only a short period of time has elapsed, where the conditions surrounding the property in controversy have changed, especially those relating to its value, and affecting injuriously the interests of innocent defendants.'

"In this case a delay of three years in asserting an interest in oil land was held laches.

"In Societe Fonciere et Agricole des Etats Unis vs. Milliken, 135 U. S. 304, 10 Sup. Ct. 823, 34 L. Ed. 208, it was held that a delay of two years in commencing proceedings to set aside a judgment for usury constituted laches.

"In Twin-Lick Oil Co. vs. Marbury, 91 U. S. 587, 23 L. Ed. 328, a delay of approximately four years was held a bar to the action. In Pittsburgh & Lake Angeline Iron Co. vs. Cleveland Iron Mining Co., 178 U. S. 270, 20 Sup. Ct. 931, 44 L. Ed. 1065, a delay of 2½ years was held fatal. In Patterson vs. Hewitt 195 U. S. 309, 319, 25 Sup. Ct. 35, 37 (49 L. Ed. 214) the court said: 'Indeed, in some cases the diligence required is measured by months rather than by years, * * * And in others a delay of two, three or four years has been held fatal.'

"In Brown vs. County of Buena Vista, 95 U. S. 157, 24 L. Ed. 422, a delay of seven years precluded the action. In Holgate vs. Eaton, 116 U. S. 33, 6 Sup. Ct. 224, 29 L. Ed. 538, two years, under the peculiar circumstances of that case, was held to be laches." * * * Many of the best-reasoned cases proceed on the theory that laches is not a mere matter of length of time as in statutes of limitation, but 'principally a question of the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition or relations of the property or the parties.' "

Judge Kenyon also said in that opinion that:

"The nature of the property in dispute may require more prompt action than otherwise. This is especially true as to mining and oil properties such as the situation in the case at bar. There is a special reason as to these properties why the courts should hold the parties to a rigorous rule as to laches. In Twin-Lick Oil Co. vs. Marbury, 91 U. S. 587, 592, 593 (23 L. Ed., 328), it is said by the court:

'The fluctuating character and value of this class of property is remarkably illustrated in the history of the production of mineral oil from wells. Property worth thousands to-day is worth nothing to-morrow; and that which would to-day sell for a thousand dollars as its fair value may, by the natural changes of a week or the energy and courage of desperate enterprise, in the same time be made to yield that much every day. The injustice, therefore, is obvious, of permitting one holding the right to assert an ownership in such property to voluntarily avait (await) the event, and then decide,

when the danger which is over has been at the risk of another, to come in and share the profit.' "

Concluding the opinion affirming the decree below this further was said:

"It is a fair inference from the record that during the time that he claims to have been partner and acting under a partnership agreement he had no communication with his partners; that he never demanded any accounting from them nor an explanation of their exclusion of him from the business. The language of Judge Thayer in Curtis vs. Lakin, 94 Fed. 251, 254-255, 36 C.C.A. 222, 225, is singularly in point, and is as follows: 'Men of average intelligence and business sagacity would not ordinarily permit mining property in which they had a large interest, and which they believed to be valuable, to be sold and otherwise dealt with by a third person as his own, without remonstrance, on their part, and without seeking for an explanation, unless they were well aware that he asserted a legal right to so deal with it, and that any remonstrance on their part or attempt to obtain a recognition of their rights would be vain and useless, unless it took the form of a suit to enforce their alleged rights. We think, therefore, that the conclusion is well warranted by the allegations of the bill that for more than two years before it was filed the plaintiffs remained silent and inactive, knowing that Lakin claimed the Utah mines as his own, yet intending to assert a title thereto in case they proved to be productive and valuable, but to deny all interest therein and all liability for obligations which Lakin might incur in attempts to develop them, provided they proved to be barren and valueless. This seems to be the only reasonable explanation of the plaintiff's silence and inaction for a period of two years or more, in view of facts that were then well known to them, when their actions are judged by the tests which are usually applied to determine the motives which prompt human conduct.' "

The entire opinion in the Taylor case last cited presents an extremely exhaustive review of the doctrine of laches as applied to claims asserted for mining and oil

lease properties. The language of the Supreme Court of the U. S. quoted by the learned judge has been excerpted as most apropos and noteworthy where cases of the character now before us are involved.

See also Hodgson vs. Federal Oil & Development Co. et al 285 Fed. 546, opinion by Judge Kennedy and where a similar result was reached.

The appellate courts in England are in accord with the views of the courts in this country relative to matters of this kind. In Clarke & Chapman vs. Hart, 6 House of Lords Cas. 633 10 Reprint 1443, the Lord Chancellor (Lord Chelmsford) remarked that:

"The case of mines has always been considered by a court of equity as a peculiar one. The property is of a very precarious description, fluctuating continually, sudden emergencies arising which require an instant supply of capital, and in which the faithful performance of engagements is absolutely necessary for the prosperity and even the existence of the concern. And, therefore, where parties under these circumstances stand by and watch the progress of the adventure to see whether it is prosperous or the contrary, determining that they will intervene only in case the affairs of the mine should turn out prosperous, but determining to hold off if a different state of things should exist, courts of equity have said that those are parties who are to receive no encouragement; that if they come to the Court for relief, its doors shall be closed against them; that their conduct being inequitable, they have no right to equitable relief."

Under the facts presented by the record before us and the authorities reviewed as above we are constrained to say that the judgment of the district court of Weston County was right whether viewed as a determination that there was no joint adventure between Orville Eblen, Frank Eblen, Sr., and Tom Eblen or that

the plaintiff is chargeable with laches in asserting his alleged claim to the lands herein involved. The judgment of the district court aforesaid should be accordingly affirmed.

*Affirmed.*

KIMBALL, C. J., and BLUME, J., concur.