### HODGSON v. FEDERAL OIL & DEVELOPMENT CO. et al.

(District Court, D. Wyoming. December 16, 1922.)

#### No. 1273.

1. **Tenancy in common** &#9756;15(1)—**Adverse title may be established between cotenants depending on circumstances.**

   There is no inflexible rule that a cotenant can never acquire a title adverse to the other cotenants, but such title may be established depending upon the individual circumstances of the case at hand.

2. **Tenancy in common** &#9756;15(7, 8)—**Constructive notice of adverse possession by cotenant is sufficient unless there is actual dependence.**

   The constructive notice of adverse possession by a cotenant given by a recorded deed purporting to convey an undivided interest to the tenant in possession is sufficient to enable the tenant in possession to acquire title by adverse possession as against his cotenant unless the relation between

them is such that there is an actual dependence by the tenant out of possession upon his cotenant.

3. Tenancy in common ⟨key⟩15(5)—Possession under attorney's deed purporting to convey entire estate held color of title.

Possession of an oil claim under a deed purporting to convey the entire interest in the claim, which had been executed by an attorney for the eight cotenants of the claim, was possession under color of title, even though the deed was not a valid exercise of the power, so that the right of one of the original cotenants was barred under the Wyoming statute of limitations (Comp. St. 1920, § 5564) 10 years after the execution of the deed.

4. Mines and minerals ⟨key⟩36—Executive withdrawal of public lands does not prevent assertion of a claim initiated prior thereto.

The executive withdrawal from entry of certain oil lands did not interfere with the assertion of a claim as cotenant to an interest in a claim initiated prior to the order.

5. Mines and minerals ⟨key⟩38(5)—Doctrine of laches is applied strictly to claims to oil lands.

The rule of laches requiring a suitor to plead and prove some adequate excuses for his silence and inaction where there has been apparent want of diligence is applied with great strictness where the claim involves title to oil lands, the value of which fluctuates greatly and rapidly.

6. Mines and minerals ⟨key⟩38(5)—Claimant's interest in oil claim held barred by laches.

The failure of plaintiff's assignors to ascertain their rights in an oil claim for 20 years after the death of their ancestor, through whom they claimed, though the records were open to their inspection, which would have disclosed their rights, during which period a grantee of the entire interest in the claim had secured a lease from the United States and had developed the property into a property of great value, *held* to bar plaintiff's right to an interest in the claim.

In Equity. Suit by James M. Hodgson against the Federal Oil & Development Company and others to impress a trust upon an oil lease. On motion to dismiss. Motion granted, and bill dismissed.

J. M. Hodgson, of Cheyenne, Wyo., and R. R. Stewart, of Washington, D. C., for plaintiff.

Harold D. Roberts and Paul P. Prosser, both of Denver, Colo., for defendants.

KENNEDY, District Judge. The above-entitled cause is a suit in equity to impress a trust in the nature of an undivided one-eighth interest upon a certain lease or the benefits accruing therefrom granted by the United States Department of the Interior to the defendant Federal Oil & Development Company.

The bill is attacked by a motion to dismiss, alleging facts insufficient to constitute a cause of action, laches and a bar by the statute of limitations, a final determination of the matters involved by the Department of the Interior, and the failure to join the United States as an indispensable party defendant.

Omitting the formal allegations of the bill designed to give the court jurisdiction, the statement of facts set forth which may be considered as pertinent to the disposition of the motion may be summarized as follows:

---

⟨key⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

On January 11, 1887, eight natural persons located the O'Glase claim on the S. W. ¼ of section 13, township 40, range 79, in what is now known as the Salt Creek field, then in the county of Carbon and now in the county of Natrona, in this state and district. The location was made under the placer mining laws, which were afterwards challenged as being ineffective for the location of oil lands, but by legislative enactment subsequently approved and confirmed. The requisite labor and development were performed upon the claim.

Among these eight locators was one George McManus, who subsequently died on the 16th of September, 1901, leaving as his heirs at law a widow, a daughter, and a grandson, who were never residents of the state of Wyoming, with the exception of the grandson, who became a resident a short time before the commencement of this suit, and that these heirs did not know and had no knowledge or information leading to knowledge of the right, title, and interest of the said George McManus in the lands in controversy until the date of the assignment hereinafter mentioned. In February, 1922, these heirs at law assigned all their rights in the property and premises to the plaintiff, who is a resident of this state, and whom the court recognizes as a lawyer admitted to practice in the courts of this state and this court.

On August 21, 1920, the defendant Federal Oil & Development Company filed an application for a lease of the above-described lands as the successor in interest of the locators under the act of February 25, 1920, known as the Mineral Leasing Act (41 Stat. 437). On March 25, 1921, a lease to said defendant was recommended by the Commissioner of the General Land Office, which thereafter and on April 1st was ratified and confirmed by the Secretary of the Interior and issued to said defendant.

The bill alleges erroneous representations on the part of the applicant for the lease and sets out certain findings of the Commissioner and Secretary, and particularly alleges errors of law committed by these officers in awarding the lease to the defendant company.

Among other things the Department of the Interior found that five of the locators in 1886 gave to one Cy Iba a power of attorney to locate lode and placer mining claims in the Rattlesnake mining district in the county of Carbon, territory of Wyoming, which is the mining district in which the claim in controversy was then located, and that in 1884 a similar power of attorney was granted by some of the locators to said Iba and one Fales to do practically the same things. McManus was one of the locators executing the latter power of attorney. These powers of attorney, in addition to granting the right to the attorney to locate claims, gave the right to sell and convey said claims for their principals.

On February 18, 1890, the said Cy Iba made, executed, and delivered a quitclaim deed of an undivided one-half interest in the O'Glase claim to one Victoria A. D. Johnston, and on April 12, 1905, said Iba conveyed an undivided one-half interest in the claim to one Joseph H. Lobell. On February 16, 1907, Victoria A. D. Johnston conveyed her undivided one-half interest to Frederick J. Lobell, who two days later conveyed this interest to Joseph H. Lobell, and who in turn, on Au-

gust 26, 1915, conveyed the entire claim to the defendant, Federal Oil & Development Company.

The Department then held that the so-called powers of attorney granted to the said Cy Iba were deeds of trust by which Iba was authorized to sell and convey such claims as the O'Glase after same were located, and such deeds of trust were not revocable without the consent of Iba, which consent he did not give to any one, and that it followed that Iba had the authority to convey the legal title to the O'Glase claim, which he did in the manner before specified, all of which was shown by the abstract of title filed with the application, and that the applicant thereby became the holder of the fee title, and, having surrendered the same to the United States, was entitled to the lease which it subsequently received.

It appears that on September 27, 1909, certain lands, including those in controversy, were withdrawn from entry by presidential order which held the title of lands in statu quo until the passage of the leasing act.

Plaintiff alleges that the Department of the Interior committed an error of law in this respect, that the only power of attorney executed by McManus was the one in 1884, which was a joint power to Iba and Fales, and that, Fales not having joined in any transfer with Iba, the attempted transfers were ineffectual and void in law, which transfers were held valid by the department; and, further, that the records did not show that the O'Glase claim was actually located by either the said Iba or Fales under the power of attorney, but alleges the fact to be that they were located by the locators themselves.

The bill further sets forth the powers of attorney and the deeds executed and delivered by Iba hereinbefore referred to, and that said instruments were duly made matters of record in the county in which the land is located, which as to matters of fact substantially agree with those set forth in the findings of the Department.

Many points of law have been raised under the motion to dismiss by the defendants hereinbefore referred to, some of which are separate and distinct and others of which seem to blend into each other for the purpose of a fair consideration by this court, and they will not, therefore, be given separate consideration in this memorandum.

One of the chief points of contention between counsel presented in the argument and in the exhaustive briefs filed was as to whether or not the grantees and their successors under the Iba deeds ever acquired a title which was adverse to McManus, his heirs and their assignee.

It is the earnest contention of counsel for the plaintiff that McManus being a cotenant with other locators and the defendant through Iba and his grantees being claimants under a conveyance, shown upon its face to be invalid in that it was insufficient to transfer the legal title of McManus, that neither the defendant nor its grantors could ever acquire an adverse title, and that in effect the cotenants and their grantors occupied a position of trust toward McManus out of which an adverse title never would accrue.

On the other hand, counsel for defendants maintain with equal earnestness that this rule in regard to cotenancy and such trust rela-

tionship is not inflexible, but varies according to the circumstances in each case, and in short that an adverse title begins from the date of the instrument which purports to convey the entire estate of all the co-tenants, even though in the first instance such conveyance in its strict and legal effect may not have been sufficient; in other words, that any conveyance purporting to grant away the entire title creates such a color of title as may eventually emerge in the form of an adverse title in the grantee.

[1] There are authorities tending to sustain both contentions. Aft-er a careful examination of these authorities, this court is of the opin-ion that the rule is not inflexible, and that an adverse title as between cotenants may be established, depending upon the individual circum-stances of the case at hand. One of the controlling features in this instance seems to be what the instrument itself relied upon purports to convey. In the case of Elder v. McClaskey, 70 Fed. 529, 17 C. C. A. 251, Judge Taft, then Circuit Judge, says:

"The extent of the estate purporting to be conveyed characterizes the en-try and subsequent possession, and shows beyond doubt that they were made under a claim to the whole, and were with intent to oust all others asserting an interest. This is well settled by federal and state authorities." Cases there cited.

And further on he says:

"Entering as he did under a claim to the fee of the tract in severalty, un-der deeds which purported to give such a title, we are of opinion that his possession was never in privity with claimants, as their tenant in common, or in subordination to them."

To the same effect is Pickens v. Stout, 67 W. Va. 422, 68 S. E. 354.

In the case of Steele v. Steele, 220 Ill. 318, 77 N. E. 232, the court says:

. "If one tenant in common holds exclusive possession, claiming the land as his, and his conduct and possession are of such a character as to give notice to his cotenant that his possession is adverse, the statute of limitations will run."

Mr. Justice Storey, in the case of Prescott v. Nevers, 19 Fed. Cas. No. 11,390, 4 Mason (C. C.) 326, says:

"I take the principle of law to be clear that, where a person enters into land * * * by a recorded deed, his entry and possession are referred to such title, and that he is deemed to have a seisin of the land coextensive with the boundaries stated in his deed, where there is no open adverse pos-session of any part of the land, so described, in any other person."

To the same effect is also Joyce v. Dyer, 189 Mass. 64, 75 N. E. 81, 109 Am. St. Rep. 603.

[2] Referring again to the case of Elder v. McClaskey, supra, Judge Taft, in explaining the policy of the law in holding that adverse titles should under certain circumstances accrue as between cotenants, uses the following elucidating language:

"If a tenant in common, in order to make his possession adverse to a co-tenant, is obliged to seek the latter out and actually inform him of his in-tention, then it would become impossible to set the statute running against absent heirs. whose existence and whereabouts were unknown to the tenant, and whose heirship and interest in the property were unknown to themselves.

It is certainly the policy of the law to require claims which have been latent for many years to slumber on. The disturbance of possession of long standing, if thus encouraged, would be, as said by Mr. Justice Grier in Roberts v. Moore, 3 Wall. Jr. 292, 294, Fed. Cas. No. 11,905, an intolerable mischief to the community. Cases can be stated, doubtless, where the fiduciary relation between the possessor and the owner is actual, and not created alone by the legal character of their respective titles, in which the dependence of the one upon the loyalty of the other is so complete that nothing but actual notice of the change from a subordinate to an adverse possession would suffice to set the statute running. In such cases it would seem that the relation must be of such a nature as affirmatively to discourage the owner from giving attention to conduct of the tenant. But the authorities cited show conclusively that no such rule obtains where the fiduciary relation, if such it can be properly called, is created merely by the character of the respective titles, and not by an actual personal dependence of the owner upon the possessor, and that in such cases the owner is bound at his peril to take notice of acts of the possessor of such open and notorious character, and so unmistakably indicative of an intention to exclude others from any interest in the land that the world about, including the real owner, must be presumed to know and act upon them. Any other doctrine would make of a rule of law founded on the plainest principles of natural justice and equity an instrument of oppression, and a means of seriously impairing the peace of society. Indeed, in England so much trouble has arisen from the rule that the possession of one tenant in common is the possession of all that it is now provided by statute that the exclusive possession and enjoyment of the common property by one tenant shall be held to be adverse, and set the statute running, without other proof of ouster."

Accepting these decisions as establishing a well-defined rule of law, it remains to be determined in this case whether the circumstances bring the plaintiff and his grantors within the rule.

[3] The deeds of Iba acting as attorney in fact for the grantors purported upon their face to convey the entire estate of the locators of the claim. These deeds as well as the powers of attorney became public records and so remained for many years. The first deed was executed, delivered, and recorded in the year 1890 and conveyed an undivided one-half interest, and the second deed executed, delivered and recorded in 1905 conveyed an undivided one-half interest in the O'Glase claim. The titles so granted were subsequently merged by mesne conveyances in the defendant Federal Oil & Development Company. These deeds upon their face showed a conveyance of the entire estate of the locators in the O'Glase claim, and whether sufficient in the first instance to grant a complete legal title, either on account of the legal insufficiency of the powers of attorney to do the things specified or on account of only one attorney in fact having executed the conveyance, were sufficient to invest the grantees with a color of title when followed by recording of the deeds and the possession of the grantees and to charge the locators with a constructive notice of the claim of the grantees to the entire estate so as to effect the beginning of an adverse title. It has been held in many cases that an adverse title may be established upon a mere conveyance showing color of title, and in our own State the Supreme Court has said in Bryant v. Cadle, 18 Wyo. 64, at page 88, 104 Pac. 23, at page 28:

"It is well settled that a hostile possession and claim may be based upon a void conveyance or other muniment of title."

In the case of Cameron v. United States, 148 U. S. 301, 13 Sup. Ct. 595, 37 L. Ed. 459, the Supreme Court has defined the circumstances under which a color of title exists, which definition would seem to fairly well apply to the circumstances at bar.

[4] If therefore an adverse title was established by the deeds from Iba, one of which was given in 1890 and the other in 1905, each for undivided one-half interests in the entire claim, it follows that under the statutes of Wyoming governing adverse possession the title would become complete in ten years, and would therefore accrue as to the entire property in 1915, some five or six years before the applicant for a lease filed its application. It therefore would also follow that the claim of plaintiff would 'be barred by the statute of limitations (Comp. St. 1920, § 5564). The executive withdrawal order would not seem to interfere with the assertion of claim to title by the McManus heirs initiated prior to such order.

It might be said in passing that, although the Department of the Interior did not make a specific conclusion of law in its decision on the lease in favor of the defendant upon the ground of an adverse title and the running of the statute of limitations, yet, if the conclusions of this court are sound in this respect, it proves that the decision of the Department was correct, and the Department simply did not go so far as to outline all the legal conclusions which might have been drawn from the facts before it.

Closely akin to the question just discussed is the contention by counsel for defendants that the plaintiff has failed to allege sufficient reason and excuse for the inactivity and failure of himself and his assignors to make any claim to the rights here asserted until the lapse of so long a time. The excuse pleaded is that plaintiff's assignors were nonresidents of the state and their lack of knowledge or means of knowledge in ascertaining their rights and interests in and to the property in controversy, which question is in its nature but a part and parcel of what this court considers to be the major question for determination raised by the motion to dismiss, viz. laches.

[5] This particular question has been so fully discussed in a recent decision of the Court of Appeals of this circuit in the case of Taylor v. Salt Creek Consolidated Oil Co., 285 Fed. 532, filed November 15, 1922, in which the opinion was written by Judge Kenyon, that it would seem unnecessary for this court to go at length into the discussion of this phase of the case. The case cited involves the question of laches solely with respect to impressing a trust upon an oil lease secured from the government under the leasing act. One of the salient features accentuated by this recent authority is that the fluctuating character and value of so-called oil properties are such as practically to require a strict application of the doctrine as applied to this class of property. In that case Judge Kenyon has quoted with approval from another court the following language:

"This latter rule, requiring a suitor to plead and prove some adequate excuse for his silence and inaction in every instance where there has been an apparent want of diligence, is applied and enforced with great strictness in those cases where a person seeks to fasten upon another a constructive trust with respect to personal or real property, and in those cases, as well.

where the property in controversy has rapidly appreciated in value, or has been improved by those in possession, or when the rights of numerous third parties have intervened and attached."

He also quotes from the case of Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328, as follows:

"The fluctuating character and value of this class of property is remarkably illustrated in the history of the production of mineral oil from wells. Property worth thousands to-day is worth nothing to-morrow, and that which would to-day sell for a thousand dollars as its fair value may, by the natural changes of a week or the energy and courage of desperate enterprise, in the same time be made to yield that much every day. The injustice, therefore, is obvious, of permitting one holding the right to assert an ownership in such property to voluntarily await the event, and then decide, when the danger which is over has been at the risk of another, to come in and share the profit."

[6] This decision clearly reflects what the attitude of the federal courts of this district should be in cases of this character in applying the rule of laches. The facts in the case as set forth in the bill clearly show that during all the time that the oil development was proceeding in this state nothing was done by the plaintiff's assignors to ascertain or determine their rights, if any, in the premises in controversy, although the records were open to them to ascertain after the death of McManus whether or not he had any interest in property in the state of Wyoming, which records would have shown them that he originally at least had an interest in an oil location, and that some one subsequently had purported to transfer that interest under a power of attorney executed by him. These records were at least likewise a sufficient challenge to the rights of McManus to incite them to assert their interest in the property if they desired to do so, but they have sat quietly by and permitted some one else to bring into form and being a latent property right which the bill shows now to be of a value of approximately $2,400,000. As before stated herein, the only excuse pleaded for the failure to take affirmative action sooner is that plaintiff's assignors were nonresidents of the state and had no actual knowledge or means of knowledge of their right or interest in the property. The records set forth in the bill at least show a means of knowledge open to them had they been reasonably diligent. Swift v. Smith, 79 Fed. 709, 25 C. C. A. 154; Bacon v. Chase, 83 Iowa, 521, 50 N. W. 23; Redd v. Brun, 157 Fed. 190, 84 C. C. A. 638; Williamson v. Beardsley, 137 Fed. 467, 69 C. C. A. 615; Teall v. Slaven (C. C.) 40 Fed. 774, affirmed Teall v. Schroder, 158 U. S. 172, 15 Sup. Ct. 768, 39 L. Ed. 938.

The views of this court herein expressed make it unnecessary to consider the other points raised by counsel for defendants under the motion to dismiss, although several of them are persuasive, but those considered seem to be such as should control a court of equity in administering justice in its larger sense by disposing of the case upon those points which go to the merits of the controversy shorn of technicalities.

For the reasons stated, the bill will be dismissed at the costs of the plaintiff.