ATLANTIC RICHFIELD COMPANY,
Plaintiff,

v.

CRA, INC., Defendant.

Civ. A. No. CA–6–74–10.

United States District Court,
N. D. Texas,
San Angelo Division.

Sept. 19, 1975.

W. B. Browder, Jr., Stubbeman, McRae, Sealy, Laughlin & Browder, Harrell Feldt, Midland, Tex., for plaintiff.

Bryan W. Scott, Urban, Coolidge, Pennington & Scott, Houston, Tex., Ralph E. Hoke, Kansas City, Mo., Michael D. Stewart, Thomas J. Sims, Houston, Tex., for defendant.

## MEMORANDUM OPINION

WOODWARD, District Judge.

This action was filed originally in the 51st Judicial District of Texas in and for Irion County. Defendant, CRA, Inc. (CRA) subsequently removed the case to this court. The parties to this suit are citizens of different states, the amount in controversy exceeds $10,000.00, and this court has jurisdiction under 28 U.S.C. § 1332.

The above case was tried before the court without a jury on the 26th and 27th days of August, 1975, with representatives of all parties and their attorneys present at such time. After hearing and considering the evidence, the briefs and arguments of counsel, the court files this memorandum which shall constitute the court's findings of fact and conclusions of law in support of the judgment hereinafter ordered to be entered. In addition, all of the stipulations and agreements of the parties as to the facts in this case are incorporated herein as a part of the court's findings of fact.

In 1958 and 1959, two contracts, Plaintiff's Exhibits 1 and 2, were consummated between plaintiff Atlantic Richfield Company's (ARCO) predecessor in interest as the seller or producer, and the defendant CRA's predecessor in interest as the purchaser or processor under said contracts. The subject matter of the contracts was the production and processing of casinghead gas from oil wells on certain leases belonging to ARCO in Irion County, Texas.

The casinghead gas, by the terms of these contracts, was to be delivered into the gathering system of CRA and then processed in the Mertzon plant so as to remove the natural gasoline, propane and butane, known collectively as "plant products." In the 1958 contract, Plaintiff's Exhibit 1, the then owner conveyed and assigned to CRA a 60% interest in all of the liquid hydrocarbons recovered from the casinghead gas. In the 1959 contract, Plaintiff's Exhibit 2, title to 100% of the casinghead gas produced from said wells was transferred by the owner to the processor. For the purpose of payment, each contract provided that a test would be run on the gas stream at the point of deliv-

ery in order to determine the amount of natural gasoline contained in the casinghead gas on a thousand cubic feet basis. Two alternative methods of testing were specifically named in the contract—the charcoal test or the field compression test. Once the amount of natural gasoline was determined, 40% of this natural gasoline was to have been allocated· and paid to ARCO at a specified rate. The 1958 contract contained a formula to be used in determining the amount of processed natural gasoline for which ARCO was to be paid. Even though the 1959 contract contained no such formula for the allocation of natural gasoline, the natural gasoline under both contracts was allocated on the basis of the 1958 contract formula. An identical method of payment for butane and propane was provided, with one significant exception. Because neither the charcoal nor field compression test would indicate the exact amount of butane and propane in the casinghead gas, the contract set forth a formula for determination of the amount of such butane and propane to be allocated to ARCO by the processor. This formula was a ratio which was based upon the measurable product—natural gasoline. The formula had as its numerator the total quantity of ARCO's test gallons of gasoline contained in the casinghead gas as measured by either the charcoal or field compression test at the delivery point. The denominator consisted of the total quantity of test gallons of gasoline contained in the casinghead gas delivered from all delivery points connected to the plant, from ARCO's leases and wells as well as oil wells owned by others. Thus, the ratio was nothing more than a proportion of natural gasoline produced by ARCO to the natural gasoline produced by all other producers in the Mertzon gathering system. This fraction then would be multiplied by the total quantity of each separate product processed by the plant, and ARCO would be paid for 40% of this figure.

The allocation of butane and propane by a ratio based on natural gasoline content was done because no test at that time accurately measured the butane and propane

content. At some later time, in the early 1960's, the chromatograph test, one which could measure the butane and propane content, came into use. Nevertheless, at the time of the consummation of the contracts, the charcoal and field compression tests were the accepted methods for such tests used in the industry.

The tests provided for in the contract were to be run semiannually by an independent testing company, the Petroleum Analytical Laboratories Services (PALS). The evidence shows that during the period of time that CRA has been operating the Mertzon plant, from August 1968 to the present, PALS performed both field compression tests and chromatograph tests. At least some of the PALS reports showing the results of these semiannual tests were mailed to ARCO and ultimately were given to their accounting department. These particular reports of the semiannual tests are contained in Plaintiff's Exhibit 3 and they show the fractional analysis resulting from chromatograph tests that were made of natural gasoline, butane and propane. Additionally, monthly statements showing the net amount due to ARCO each month were mailed by CRA to ARCO; these are shown by Plaintiff's Exhibits 3 through 9.

The court finds that the chromatograph test is more accurate of the three tests involved in this trial but that the chromatograph test was not provided for in the contracts. Furthermore, it has been proven that the use of the contract formula for allocation of butane and propane in some cases could result in an allocation to ARCO by CRA of an amount that would be in excess of 40% of the butane and propane contained in ARCO's casinghead gas as indicated by the chromatograph test. This could result in an obvious hardship to CRA, for it would be allocating more than 40% of the butane and propane as shown by chromatograph and CRA would be retaining less than 60% of the butane and propane as shown by chromatograph.

The evidence is clear and the court finds that CRA did not use the formula set forth in the contracts in order to determine the

amount of payment to ARCO for butane and propane. Rather, CRA used the chromatograph test to allocate butane and propane to ARCO for the purpose of payment. The allocation based on the chromatograph normally was less than an allocation based on the contract formula.

ARCO has brought this suit against CRA and has alleged that if the contract formula had been used to compute the payment due to ARCO for its 40% interest in plant products then ARCO would have received an additional $131,402.10. The proof in this case supports the finding of this court that had the contract formula strictly been applied that ARCO indeed would have been paid an additional $131,402.10 over the period in question. ARCO also has complained that CRA further violated the contract by using the chromatograph test rather than the charcoal or field compression test. The use of chromatograph test to measure the natural gasoline content for use in the contract formula, however, would make no actual difference in the amount of payment to ARCO. Although the chromatograph test shows approximately 20% higher natural gasoline content than either the charcoal or field compression test, the ratio in the contract formula would remain the same because both the numerator and the denominator would be increased by 20%. So the actual financial loss resulted to ARCO not because of the use of the chromatograph test, although technically this was a violation of the contract, but because CRA used the chromatograph tests results to allocate butane and propane rather than using the contract formula as a method of allocation. Accordingly, ARCO claims that these amounts should be recomputed in strict accordance with the contract formula and the difference between the recomputed amounts and the amounts actually paid should be paid to it as its damages plus pre-judgment interest.

CRA readily admits that it did not allocate the propane and butane by the contract formula but rather on the basis of the results of the chromatograph test. Justification for what amounts to a departure from the terms of the contract is founded upon two contentions: first, contradictory clauses in the contracts should permit an interpretation thereof which would allow allocation by chromatograph; and, second, ARCO should be estopped from claiming a breach of contract.

CRA maintains that the conveyance clause and the settlement clause in each contract are repugnant. The conveyance clauses convey 60% of the plant products in one contract and 100% in the other while the settlement clauses provide a method of settlement for propane and butane based upon the natural gasoline content. The contradiction contended is that through the application of the settlement formula ARCO would receive more than its 40% of the proceeds of the sale of the product. Measurement by chromatograph, which admittedly is the most accurate test, shows the "actual" content of propane and butane; the contract formula doesn't measure propane and butane actually contained in the gas stream, but is used to allocate and is based on natural gasoline content. Consequently, the amount of butane and propane allocated by formula often exceeds the amount of propane and butane contained as indicated by chromatograph. Thus, because ARCO often would be allocated more than 40% if the formula was applied, CRA contends that the clauses are in conflict and the contract should be interpreted to effectuate the intent of the parties that ARCO was to receive not more than 40% of the products. Because the chromatograph test is the most accurate, CRA feels that its use is justified.

■ The court, however, does not construe these provisions of the contracts to be in conflict. The provision that CRA would own 60% and that ARCO would own 40% is not repugnant to a provision that ARCO would be paid for its 40% on the basis of the formula set forth. The formula given is nothing more than the method of arriving at the amount of payment to ARCO for its retained interest. CRA contracted to pay for this retained interest on the basis of a certain test and a certain formula, both of

which are set forth clearly in the contract. CRA cannot be relieved of its burden of compliance with the contract simply because a new, more accurate test has been developed. Although the chromatograph is more accurate than the field compression or charcoal tests, and it would allocate the products more accurately than does the contract formula, it was not the method of testing or the method of allocation provided for in the contracts.

As its second justification for noncompliance with the contracts, CRA claims that ARCO should be equitably estopped from insisting upon the application of the contract formula. For the doctrine of equitable estoppel to apply, there are certain elements which must be present. The person against whom the estoppel is to apply must have actual or constructive knowledge of the facts and must have induced, through his words or conduct, another to rely upon the purported representation. The party seeking to assert estoppel must have had neither knowledge nor a reasonable means or opportunity of obtaining knowledge of the facts and must have relied upon the other party's representations to his detriment. *See Barfield v. Howard M. Smith Company*, 426 S.W.2d 834, 838 (Tex.1968); *Champlin Oil & Refining Co. v. Chastain*, 403 S.W.2d 376, 385–86 (Tex. 1965). The party seeking to assert estoppel has the burden of proving each and every element thereof. *Barfield v. Howard M. Smith Company, supra.*

CRA has attempted to satisfy its burden in the following manner. ARCO supposedly knew or should have known that CRA was using the chromatograph test and that this test and not the formula was being used to allocate propane and butane. In support thereof, CRA relied upon the semiannual reports submitted to ARCO. These PALS reports show a fractional analysis of the gas products, a breakdown that can only be provided through the use of the chromatograph test. Therefore, when ARCO received these reports, it should have known that the chromatograph test was being used.

Although the PALS reports were structured in this manner, other evidence tends to overshadow this fact. First, Plaintiff's Exhibits 16 and 17 show that the contractually proper compression test by PALS was used and formed the basis of some reports as late as June 1, 1970. Next, in contrast to the frequency of the semiannual reports, ARCO was receiving monthly settlement statements from CRA. No witness was able to state that there was anything on the monthly settlement statements to indicate what type of test had been used. Furthermore, witnesses for the defendant stated that in order to ascertain what allocation method was being used to compile the monthly settlement statements, ARCO would have had to have had the PALS reports, the monthly settlement statements, and either the work papers of CRA or a statement of total production of such products from the plant. ARCO had neither of these last two items.

In connection with the nonconclusive nature of the monthly settlement statements, the court would point out that these statements indicate thereon the percentage of natural gasoline that was used in reaching the settlement. These statements contain nothing about a percentage allocated for settlement purposes for butane and propane, even though the use of the chromatograph test would so indicate. If these statements are not outright deceptive, they are certainly such as to lead an ordinary, reasonable producer of gas to believe that the contract formula was being used, for it is that formula that had as its basis the natural gasoline percentage. Consequently, the court finds that ARCO did not have in its possession and CRA never furnished to ARCO sufficient facts, reports, or information that would enable ARCO to determine whether or not the contract formula was being employed by CRA in its monthly payments.

CRA has attempted to saddle ARCO with constructive knowledge of the failure of the processor to use the contract formula. An audit of CRA's predecessor in interest was conducted by ARCO in 1964; the

contention is that by virtue of this audit ARCO, had it utilized a reasonable inquiry, should have learned that the contract formula was not being used in the monthly settlement statements. CRA's contention once again is not supported by the facts. The purpose of the audit was not to check compliance with the contract formula, but to determine whether or not a three year pay out period had expired or had been extended by a *force majeure* clause. Also, the audit was shortened in part by the uncooperative attitude of the processor. The fact that ARCO could have demanded additional documents to lead into an investigation of compliance with the contract formula is not sufficient within itself to shoulder ARCO with constructive knowledge of noncompliance. At the time of the audit, there was no reason for ARCO to suspect noncompliance by the processor, the scope of the audit did not encompass noncompliance, and the duration of the audit was inadequate to afford such an investigation. ARCO cannot be held to be in constructive knowledge of the processor's noncompliance with the contract formula by virtue of the fact of the 1964 audit.

CRA finally has shown that on certain occasions some ARCO employees witnessed PALS conduct chromatograph tests. CRA asserts that this constitutes knowledge by ARCO of noncompliance with the contract formula, but this assertion also must fail. First, the ARCO employees also witnessed PALS conduct field compression tests, as provided for in the contract. Second, the use of the chromatograph test by itself doesn't mean that the contract formula was not being used. The chromatograph test could be used to determine the natural gas content, and the allocation method provided in the contract could be used at that point. The mere witnessing of a chromatograph test, in addition to the field compression test, does not permit a finding or inference that ARCO had knowledge that the formula called for in the contract was being ignored.

It thus can be seen that CRA has failed to uphold its burden of proof of the elements of estoppel, for it has failed to provide sufficient evidence to show that ARCO either knew or should have known of the allocation by chromatograph test rather than by the contract formula. In this connection, the court would point out the factual distinction between this case and *Champlin Oil & Refining Co. v. Chastain, supra,* upon which the defendant relied heavily. In *Champlin* the processor sent a letter which notified the producers of a discrepancy between the contract allocation method and the allocation method utilized by the processor, and which asked for objections or questions concerning the procedure. Thus, by virtue of this letter, the producer could be reasonably expected to know of the discrepancy. In the present case, however, there is nothing that would allow the court to find that ARCO had sufficient knowledge or could reasonably have been expected to have knowledge after due diligence and inquiry of the allocation method used by CRA.

CRA next has pled the application of the four year statute of limitations. Tex. Rev.Civ.Stat.Ann. art. 5527. The plea is futile however, for the court finds that the statute is tolled. CRA has committed certain acts and filed certain reports, that would in fact mislead ARCO into believing that the contract formula was being used. Again the court refers to the monthly settlement reports which indicate that the natural gasoline content was being used to allocate propane and butane. Also, ARCO's employees witnessed the taking of field compression tests. The information given on the monthly settlement statements, the witnessing of the field compression test on at least two occasions, and the failure of CRA to give sufficient reports and data which would enable ARCO to determine whether or not the contract formula was being used all compel the court to find and conclude that ARCO was misled through fraudulent concealment and the statute was tolled. *Hickok Producing & Development Co. v. Texas Co.*, 128 F.2d 183 (5th Cir. 1942); *Phillips Petroleum Co. v. Johnson*, 155 F.2d 185 (5th Cir. 1946); Tex.Rev.Civ. Stat.Ann. art. 5527.

CRA has claimed further that if ARCO should prevail, then the contract should be construed strictly and the payments should be based on the charcoal or field compression test. Since the chromatograph test usually results in figures about 20% higher than those obtained in the other tests, CRA contends that it is entitled to an offset in the amount of the excess payments. Even though the chromatograph test results are 20% higher, however, the allocation to ARCO based upon the contract formula should not be reduced, for a fraction with a numerator increased by 20% and a denominator increased by 20% remains the same fraction. Had the defendant paid the plaintiff for natural gasoline on the basis of the chromatograph results, without applying any formula, the plaintiff would have been overpaid for natural gasoline since a field compression test or charcoal test, as called for in the contract, would have provided for lesser payments to the plaintiff. But defendant is not entitled to an offset because the evidence shows that, although the 1959 contract did not call for the application of the formula, this was the method actually used in computing the amount of natural gasoline in both the 1958 and 1959 contracts. As heretofore indicated, the use of a formula on the basis of the chromatograph test or on the basis of the test provided for in the contract will result in the same payment to plaintiff for natural gasoline because by the application of this formula the numerator and denominator are proportionately increased and result in the same fraction. Therefore, the defendant's claim for offset based solely upon the use of the charcoal or field compression test is not a valid basis for any offset. Consequently, there has been no overpayment that would entitle CRA to an offset.

ARCO has claimed that it is entitled to pre-judgment interest, and this court concludes that it is so entitled in the amount of $25,206.08, which is the amount of interest at the regular rate computed from the date of payment each month during the period in contest in this case. The monthly sums due to ARCO were liquidat-ed, readily ascertainable by the contract, and interest on such sums is proper. Tex. Rev.Civ.Stat.Ann. art. 5069–1.03.

The court finally concludes that the contract in question is a "special contract" and attorneys fees are not allowable. Tex. Rev.Civ.Stat.Ann. art. 2226.

All costs will be taxed against the defendant.

A judgment will be entered accordingly.