W.A. MONCRIEF, Jr., and Charles Taubman, Appellants (Plaintiffs),

v.

SOHIO PETROLEUM COMPANY; BHP Petroleum Company, Inc., successor in interest to Monsanto Company; Grace Petroleum Corporation, successor in interest to W.R. Grace & Co.; North Central Oil Corporation; Yates Drilling Company; Martin Yates, III; and Inexco Oil Company, Appellees (Defendants).

SOHIO PETROLEUM COMPANY; BHP Petroleum Company, Inc., successor in interest to Monsanto Company; Grace Petroleum Corporation, successor in interest to W.R. Grace & Co.; North Central Oil Corporation; Yates Drilling Company; Martin Yates, III; and Inexco Oil Company, Appellants (Defendants),

v.

W.A. MONCRIEF, Jr., and Charles Taubman, Appellees (Plaintiffs).

Nos. 88–87, 88–88.

Supreme Court of Wyoming.

June 16, 1989.

Morris R. Massey of Brown & Drew, Casper, for appellants in No. 88–87 and appellees in No. 88–88.

Neil J. Short, Casper, Larry R. Veselka and Billy Coe Dyer of Vinson & Elkins, Houston, Tex., Peter A. Bjork of Poulson, Odell & Peterson, Denver, Colo., Gretchen VanderWerf of Hawley & VanderWerf, Denver, Colo., and David D. Uchner, Cheyenne, for appellees in No. 88–87 and appellants in No. 88–88.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

MACY, Justice.

This appeal and cross-appeal arises from an action brought by appellants W.A. Moncrief, Jr. and Charles Taubman seeking specific performance of an alleged contractual obligation on the part of appellees Sohio Petroleum Company; BHP Petroleum Company, Inc.; Grace Petroleum Corporation; North Central Oil Corporation; Yates Drilling Company; Martin Yates III;

and Inexco Oil Company to offer and/or assign appellants an interest in a renewed oil and gas lease and an accounting for appellants' share of the gas production attributable to their alleged interest in the disputed lease. The district court granted summary judgment to appellees upon the ground that appellants' claim was barred by laches and the applicable statute of limitations.

We affirm.

The issues presented by Moncrief and Taubman may be summarized in this manner:

1. Did the district court properly conclude that appellants' claim was barred by laches?

2. Did the district court properly determine that appellants' claim was barred by Wyo.Stat. § 1–3–105 (1977)?

Our resolution of the issues presented on direct appeal precludes the necessity of addressing the contingent cross-appeal brought by appellees, challenging the conclusion by the district court that Taubman (and, through Taubman, Moncrief) retained an interest in the renewed lease entitling him to notice of, and an opportunity to participate in, the acquisition of the renewed lease.

The facts of this case, involving myriad agreements and transactions, are complicated and cover the better part of two decades. By a written agreement dated April 2, 1968 (the Wolf Agreement), Erving Wolf and several other persons and entities (Wolf assignors) assigned to Stonehenge Oil Company, Inc. (predecessor in interest to appellants) an undivided one-fourth interest in and to the shallow rights[1] in the leases listed on Exhibits A and B (the A and B leases) to the Wolf Agreement. These leases covered approximately 64,000 acres of land in the Madden Deep Unit Area in Fremont and Natrona Counties,

Wyoming. Pursuant to the Wolf Agreement, Stonehenge also acquired an option to earn "deep rights" in the A and B leases by participating in the drilling of an exploratory well to a depth sufficient to test the Cody formation or 19,000 feet, whichever was the lesser depth.

Under separate but identical agreements, the Wolf assignors assigned to appellees, or their predecessors in interest, various fractional interests, totaling 72.92%, in the shallow rights in the same A and B leases with the same option to earn interests in the deep rights.[2] We will refer to these agreements collectively as the "Wolf Agreements" and the various assignees, including Stonehenge, as the "Wolf assignees." The Hugh S. Day lease (Day lease), the lease at issue, was listed on Exhibit B of each Wolf Agreement as one of the assigned leases. Although most of the A and B leases were within the Madden Deep Unit,[3] the Day lease, covering approximately 520 acres, was located just outside the boundary of the Unit but within the Area of Mutual Interest (AMI). The Exhibit B listing of the Day lease indicated that the lease would expire on May 14, 1972. With respect to expiring leases, paragraph 1.1.1 of the Wolf Agreements provided that: "In the event any of said leases terminates and is subsequently re-acquired by either party hereto, it shall be considered as an 'after-acquired lease' under Article III hereinbelow." Article III of the Wolf Agreements provided:

In the event that either party acquires an interest in oil and gas leases within the area delineated by the solid heavy line on the map attached [the AMI] * * *, it shall promptly offer an interest therein by notice in writing, describing the terms and conditions applicable to such acquisition, to the other party and any third parties owning interests in the

---

1. The specific definition of shallow rights in the Wolf Agreement(s) can be generally described as rights from the surface to a depth of approximately 11,500 feet.

2. The remaining 2.08% of the shallow rights in the A and B leases, with the deep rights option, was assigned to Harold B. Ehrlich. This inter-

est was subsequently acquired by W.A. Moncrief Jr.'s son, C.B. Moncrief. C.B. Moncrief was not made a party defendant by appellants.

3. The Madden Deep Unit was a federal exploratory unit encompassing approximately 70,000 acres.

Exhibit "A" and "B" leases in proportion to the ownership of each such party in said leases. * * * Each party electing to participate shall have the right to acquire an interest in the proportion that its interest assigned hereunder bears to the interest of all electing parties * * *.

Subsequent to the initial agreements described above, the following series of events transpired, eventually leading to the litigation in this case. On November 4, 1969, Stonehenge assigned its undivided one-fourth interest in the shallow rights to the A and B leases to Volunteer Oil and Gas Company. Pursuant to the terms of the assignment, Stonehenge retained its deep rights option but granted Volunteer the option to earn one-half of Stonehenge's one-fourth participatory rights in the deep rights by paying all costs attributable to Stonehenge in drilling and completing two deep test wells. In February of 1970, Stonehenge was dissolved, and Taubman, as the sole surviving stockholder, succeeded to all of its assets. On December 22, 1970, Volunteer conveyed to an affiliate of Petro–Lewis Corporation all of its one-fourth interest in the shallow rights and its option to earn deep rights in the A and B leases.[4]

Sohio, as the operator of the Madden Deep Unit, coordinated the exercise of the deep rights option by the Wolf assignees (also referred to by the parties as the Madden Group). In early 1972, Sohio reviewed the status of the A and B leases, notified the owners of shallow rights of certain leases which were to expire in the near future, including the Day lease, and held a meeting with the shallow rights owners regarding the expiring leases. Neither Stonehenge nor Taubman was notified of or included in these communications and discussions, although Petro–Lewis, as successor to Stonehenge's shallow rights, was included. Sohio recommended that leases lying outside the Madden Deep Unit, including the Day lease, be allowed to expire. The Day lease expired on May 14, 1972.

Contrary to its recommendation, Sohio reacquired or renewed the Day lease. By letter dated May 26, 1972, Sohio advised all parties owning shallow rights in the A and B leases of the Day lease renewal and offered them an opportunity to participate in the lease in proportion to their respective interests in the A and B leases. Petro–Lewis, as successor to the shallow rights of Stonehenge, was notified and elected not to participate. Neither Stonehenge nor Taubman was notified of the acquisition. All other interest owners participated, and the proportionate interest of each participant in the renewed Day lease was revised to allocate among the participants the one-fourth interest of Petro–Lewis and the expenses attributable to it. Sohio recorded the renewed Day lease in Fremont County on June 30, 1972. The partial assignments of that lease were similarly recorded on May 17, 1973. The recorded assignments did not show Taubman or Moncrief as owning any interest in the renewed Day lease.

Sohio proposed a deep test well on November 1, 1972, and all interest owners were given until December 1, 1972, to make a participation election. On December 1, 1972, Taubman assigned to Moncrief his contractual option to earn deep rights, reserving for himself a two percent overriding royalty convertible to a working interest at the completion of the well. Correspondingly, Moncrief agreed to pay all of the costs of the well attributable to Taubman's interest. The deep test well was spudded on February 14, 1973, and it reached total depth on August 8, 1974. The well was completed as a significant gas producer in October of 1974.

In 1976, Moncrief formed the Long Butte Unit, an exploratory unit adjacent to the Madden Deep Unit. The Long Butte Unit encompassed approximately 480 acres of the Day lease. Moncrief was the operator of the Long Butte Unit, and in preparation of the Unit Agreement, which indicates lease ownership within the Unit, Moncrief's staff became aware that he had no interest in the renewed Day lease. In July of 1977, Moncrief wrote to Inexco Oil Company inquiring as to why he had not received an

---

**4.** Petro–Lewis maintained its shallow rights interest in the A and B leases until 1977. Moncrief acquired some of these shallow rights from Petro–Lewis in that year.

interest in the renewed Day lease. Inexco referred the inquiry to Sohio which responded by letter dated October 13, 1977, relating that the lease had been tendered to Petro–Lewis in 1972 and that Petro–Lewis had elected not to participate in the reacquisition of the lease. Thus, Moncrief became aware that he and Taubman had lost the deep rights to that tract. Thereafter, several producing wells were drilled in the Long Butte Unit significantly increasing the value of the renewed Day lease.

In the summer and fall of 1982, Moncrief, as unit operator, prepared division orders and began making distributions of proceeds from the sales of gas from the Long Butte Unit. The division orders reflected that neither Moncrief nor Taubman had any interest in the renewed Day lease. By 1982, the Long Butte Unit was producing "full blast." In December of 1982, Raymond G. Feldman, an Oklahoma attorney engaged by Taubman in connection with Taubman's interest in the Long Butte Unit, contacted Moncrief regarding Taubman's participation in the Madden and Long Butte Units, including the Day lease. Moncrief responded by letter dated December 13, 1982, stating with respect to the Day lease:

> Regarding the Day Lease (Tract 37 of the Long Butte Unit), it appears that somehow Petro Lewis was offered this lease, evidently due to some sale or farmout that Mr. Taubman had made, and at any rate Mr. Taubman evidently was not entitled to participate. I enclose correspondence regarding this Day lease, and if you think there is any way we could win it I would be happy to pursue the matter because it is a valuable tract.

In January 1983, Feldman contacted Sohio asserting that Sohio had erred in not offering Taubman an opportunity to participate in the renewed Day lease in 1972 and requesting that Sohio assign an interest in the lease to Taubman or his successor in interest, Moncrief. Sohio responded by letter dated November 3, 1983, in which it denied the request to assign an interest, and stated that Sohio had notified the proper parties of the renewal in 1972, that Petro–Lewis had declined to participate,

and, further, that any disagreement with Sohio's interpretation of its duties under the Wolf Agreements should have been raised in 1972 and not eleven years later.

Moncrief and Taubman filed the instant lawsuit on July 18, 1984. Following extensive discovery, appellees filed a motion for summary judgment on December 1, 1987. After a hearing, the district court granted the motion. The district court determined that Sohio did have a duty pursuant to the Wolf Agreements to notify Taubman of the renewal of the Day lease and to offer him an opportunity to participate in the acquisition of the renewed lease. The district court reasoned that Taubman's right to earn deep rights was an interest retained by a third party entitling that party to such notice and opportunity. Thus, the district court found a breach of contract. The district court further held, however, that, despite the contractual breach, the claim of Moncrief and Taubman was barred by the statute of limitations and the doctrine of laches. Appellants then perfected this appeal.

■ Although the district court determined this case on the dual grounds of limitations and laches, we perceive this to be a particularly appropriate case for application of the doctrine of laches, and our decision on that basis is dispositive of this appeal. We therefore need not consider the propriety of the statute of limitations, which presents various difficulties in this case, as a ground for decision. In its order granting summary judgment, the district court found:

> That [appellants] were also guilty of laches; that the Moncrief letter to Sohio in 1977 established that [appellants] were aware of [appellees'] breach and yet did not file their lawsuit for some seven years.

Appellants contend that this finding was in error because the delay was not unreasonable and appellees were not prejudiced. We cannot agree.

Laches is an equitable defense, and its applicability depends upon the circumstanc-

es of each case.[5] *Eblen v. Eblen,* 68 Wyo. 353, 234 P.2d 434 (1951); *Taylor v. Salt Creek Consol. Oil Co.,* 285 F. 532 (8th Cir.1922) (case arising in Wyoming—which was then within the Eighth Circuit). The existence of laches is a question addressed to the sound discretion of the district court. *Gardner v. Panama Railroad Company,* 342 U.S. 29, 72 S.Ct. 12, 96 L.Ed. 31 (1951); *Park County Resource Council, Inc. v. United States Department of Agriculture,* 817 F.2d 609 (10th Cir.1987); *Moore v. State,* 553 P.2d 8 (Alaska 1976); 30A C.J.S., *Equity* § 115 (1965). Our review, therefore, must focus upon whether or not the trial court abused its discretion by invoking the doctrine of laches. *Park County Resource Council, Inc.,* 817 F.2d 609; *Moore,* 553 P.2d 8.

▮ Laches is comprised of two elements—inexcusable delay and injury, prejudice, or disadvantage to the defendants or others. *Big Piney Oil & Gas Company v. Wyoming Oil and Gas Conservation Commission,* 715 P.2d 557 (Wyo.1986); *Hartnett v. Jones,* 629 P.2d 1357 (Wyo. 1981); *Pfister v. Cow Gulch Oil Co.,* 189 F.2d 311 (10th Cir.), *cert. denied* 342 U.S. 887, 72 S.Ct. 177, 96 L.Ed. 665 (1951). In the instant case, the record clearly supports the district court's finding that appellants had actual knowledge in 1977 that they had not been conveyed an interest in the renewed Day lease. Appellants, however, delayed filing this lawsuit until 1984, a delay of nearly seven years.[6] Appellants offer no plausible excuse for the extended delay, and none is apparent in the record other than disinterest until the lease became valuable. Although apparently conceding inexcusable delay, appellants assert a lack of resulting prejudice to appellees. We disagree.

Innumerable cases have established that the doctrine of laches is particularly applicable to oil and gas and mining claims due to the nature of such property interests. *See, e.g., Torgeson v. Connelly,* 348 P.2d 63 (Wyo.1959); and *Eblen,* 234 P.2d 434. The rationale for strict application of laches in these cases was expressed by the United States Supreme Court in the oft-cited case of *Twin–Lick Oil Company v. Marbury,* 91 U.S. (1 Otto) 587, 592–93, 23 L.Ed. 328 (1875):

> The fluctuating character and value of this class of property is remarkably illustrated in the history of the production of mineral oil from wells. Property worth thousands to-day is worth nothing to-morrow; and that which would to-day sell for a thousand dollars as its fair value, may, by the natural changes of a week or the energy and courage of desperate enterprise, in the same time be made to yield that much every day. The injustice, therefore, is obvious, of permitting one holding the right to assert an ownership in such property to voluntarily await the event, and then decide, when the danger which is over has been at the risk of another, to come in and share the profit.

Similarly, in *Patterson v. Hewitt,* 195 U.S. 309, 321, 25 S.Ct. 35, 49 L.Ed. 214 (1904), the Supreme Court stated:

> There is no class of property more subject to sudden and violent fluctuations of value than mining lands. * * * Under such circumstances, persons having claims to such property are bound to the utmost diligence in enforcing them, and there is no class of cases in which the doctrine of laches has been more relentlessly enforced.

*See also Amerada Petroleum Corporation v. Rio Oil Co.,* 225 F.Supp. 907 (D.Wyo.1964) (doctrine of laches must be relentlessly enforced in this case because

---

**5.** The governing maxim regarding laches is: " 'Equity aids the vigilant, not those who slumber on their rights.' " *Crowell v. City of Cheyenne,* 54 Wyo. 459, 93 P.2d 934, 939 (1939), and W. de Funiak, *Handbook of Modern Equity* § 21 at 46 (1950).

**6.** Appellees also contend that appellants had constructive notice that they had no interest in the renewed Day lease as of June 30, 1972, when the renewed Day lease was recorded, or alternatively as of May 17, 1973, when the assignments of the lease were recorded. The district court did not rely upon this alleged constructive notice to find laches in this case, and we will similarly limit our holding to the period beginning with actual notice.

of the fluctuating and speculative character of oil and gas leases—mining and oil properties require extremely prompt action); *Pope v. Pennzoil Producing Company*, 288 Ark. 10, 701 S.W.2d 366 (1986) (oil and gas properties are unusual, requiring diligence on the part of parties claiming an interest—parties asserting title thereto must act more promptly than in ordinary cases); and 5 W. Summers, *The Law of Oil and Gas* § 997 (1966) (the rule in oil and gas cases is that a claimant for equitable remedies must bring his action promptly—rather than withholding it and speculating on the outcome before commencing suit).

With respect to prejudice to appellees or others, a significant increase in the value of the property is a relevant consideration. In *Merrill v. Rocky Mountain Cattle Co.*, 26 Wyo. 219, 181 P. 964 (1919), this Court affirmed the denial of specific performance to convey certain lands upon which oil had been discovered. The decision was premised on both contract grounds and laches. Regarding laches, we quoted *Patterson*, 195 U.S. at 317, 25 S.Ct. at 36, to the effect that, in addition to the passage of time, a change in the value of the property was a material consideration in application of the doctrine of laches. We then noted:

> Thus, with knowledge of the facts, the plaintiffs waited before asserting their right here claimed until the value of the land for oil purposes had been demonstrated by the defendant Phelps through his lease to said operating company, allowing their decision to insist upon what they now claim as their right to depend upon the success or failure of the drilling operations carried on at the expense of others.

*Merrill*, 181 P. at 975. In *Madrid v. Norton*, 596 P.2d 1108, 1120 (Wyo.1979), *quoted in Hartnett*, 629 P.2d at 1364, we stated:

> There is an inherent injustice in one purportedly holding a right to assert an ownership in property to voluntarily await the propitious event and then decide, when the danger which has been at the risk of another is over, to come in and claim a share of the profits.

Similarly, in *Amerada Petroleum Corporation*, 225 F.Supp. 907, the court held that the defendants' hostile claims against certain Wyoming property were barred, *inter alia*, by laches, where the defendants had known for years of the existence of the property but, thinking it worthless, delayed prosecuting their claims until approached by an oil company regarding mineral leasing. The court in that case observed:

> The rule of laches must foreclose tardy claimants from asserting any rights in property when they sit quietly by and permit some one else "to bring into form and being a latent property right" which only in recent years appeared to have considerable or potential value. *Hodgson v. Federal Oil and Development Co., et al.*, 285 F. 546 (Wyo.) (1922).

*Id.* at 914. In J. Pomeroy, *Specific Performance of Contracts* § 407 at 864 (3d Ed.1926), the author states:

> Where a vendee delays in completing the contract in order that he may speculate upon the chances of its proving to be an advantageous bargain, or that through a rise in value or other change of circumstances his gain may be assured, and then when he is thus certain that it will be a fortunate speculation offers to perform and sues to compel a conveyance by the vendor, a court of equity will refuse to grant him the remedy * * *. And a rise in value of the land during the interval will always be a fact of much weight in tending to show that the vendee's delay was speculative * * *.

(Footnotes omitted.) Thus, a significant increase in value during the period of delay, where the claimant might have asserted the right before such change, is ordinarily fatal to the plaintiff's case. *See* 30A C.J.S., *supra* at § 118, and cases cited therein.

In the case at bar, appellants had actual notice in 1977 that they had not been conveyed an interest in the renewed Day lease, and yet they waited until 1984 to bring this action. Moncrief, in his deposition, made several revealing statements regarding appellants' delay in pressing their claim. Moncrief stated: "[A]fter getting that let-

ter from Sohio in 1977, I really didn't do much on this until about '82 or '83, somewhere in there. There really wasn't much happening." Thereafter, the following exchanges occurred:

> Q The question is: Is it your testimony today that you had the same interest and motivation in seeking to be allowed to participate in the Day renewal lease in '76 and '77 as you did in 1982?

> A I might have been a little more interested in '82. Is that your question?

> Q Yes, sir. I mean had any circumstances changed?

> A I might have been a little more interested then.

> Q Would that be due to the fact that there had been five, or six or seven wells drilling on the Long Butte Unit in the meantime?

> A I would say that would be correct.

> \* \* \* \* \* \*

> Q \* \* \* As of 1977 at least, you knew Sohio took the position that you and Mr. Taubman did not participate in the Day renewal lease; is that correct?

> A That's when Sohio wrote me a letter dated '77?

> Q Yes, sir.

> A I was aware of that through that letter.

> Q And after becoming aware of that, you did not take action to try to enforce or assert your claim until Mr. Taubman was pressing the claim in order to try to get a larger portion of the revenue stream attributed to him after you started handing out distributions from the Long Butte Unit in late 1982?

> A I believe what you said is correct.

In December 1982, Moncrief wrote to Feldman, Taubman's attorney, regarding Taubman's retained interest in the Long Butte and Madden Units. The letter, as noted earlier in this opinion, included a response to Feldman's prior inquiry regarding the Day lease. Moncrief wrote: "I enclose correspondence regarding this Day lease, and

if you think there is any way we could win it I would be happy to pursue the matter because it is a valuable tract."

The record clearly indicates that the value of the renewed Day lease increased dramatically between 1977 and 1984 as a result of extensive drilling in the Long Butte Unit. Additionally, the record establishes that appellees paid the expenses attributable to the Day lease for the area development. From the deposition testimony and correspondence highlighted above, it can readily be seen that for several years appellants lacked sufficient interest in the Day lease to pursue their claim, until it became apparent that the Day lease was quite valuable. In the meantime, production attributable to the lease had begun, with a corresponding distribution of revenues to the various fractional interest owners.[7] While it is true, as appellants point out, that they (i.e., Moncrief) contributed considerable sums in developing the area as a whole, which development established the value of the Day lease, they nevertheless did not contribute costs attributable to the Day lease, and they simply were not interested in pursuing their asserted right to participate in that lease until its value became apparent. As in *Merrill*, 181 P. 964, appellants here delayed their decision on whether to assert a claim on this lease until its value was established by drilling operations. Appellants, in their complaint, indicate their willingness to reimburse appellees for the costs of development attributable to the Day lease. With respect to a similar offer by the plaintiff in the *Eblen* case, we observed:

> Yet for some five or six years he did nothing to assert his claimed rights in this property. It is true that now he offers to pay "his share" of the cost of development of these lands. That hardly satisfies the equities of the situation. The risk in this matter is all over at this time.

*Eblen*, 234 P.2d at 442. As appellees point out in their brief, any claimant would be willing to pay his share of expenses once

---

7. Production attributable to the Day lease, as only one of numerous leases in the Long Butte Unit, represented only a fraction of the overall production from the Unit. Moncrief and Taubman participated in the revenue distributions from the balance of the Unit.

the risk is over and the economic benefit is obvious.

Under the circumstances of this case, we hold that application of the doctrine of laches to bar appellants' claim was justified. The district court did not abuse its discretion by granting summary judgment to appellees on the basis of laches.

Affirmed.

THOMAS, J., filed a concurring opinion.

THOMAS, Justice, concurring.

I concur in the result of the majority opinion. I would, however, ground that result upon the statute of limitations, and would have no occasion then to consider the application of the doctrine of laches to these facts.

I recognize that, in tort cases, Wyoming has adopted the discovery rule for purposes of ascertaining when a cause of action accrues. *Mills v. Garlow,* 768 P.2d 554 (Wyo.1989); *Ogle v. Caterpillar Tractor Company,* 716 P.2d 334 (Wyo.1986); *Young v. Young,* 709 P.2d 1254 (Wyo. 1985); *Metzger v. Kalke,* 709 P.2d 414 (Wyo.1985); *Olson v. A.H. Robins Company, Inc.,* 696 P.2d 1294 (Wyo.1985); *Duke v. Housen,* 589 P.2d 334 (Wyo.1979), reh. denied 590 P.2d 1340, cert. denied 444 U.S. 863, 100 S.Ct. 132, 62 L.Ed.2d 86 (1979). The adoption of a discovery rule for purposes of determining when a tort action accrues does not necessarily mean that the discovery rule has been adopted for all purposes.

The general rule throughout the United States is that a cause of action for breach of contract accrues at the time of the breach. *Paul Holt Drilling, Inc. v. Liberty Mutual Insurance Company,* 664 F.2d 252 (10th Cir.1981); *Carman v. Prudential Insurance Company of America,* 748 P.2d 743 (Alaska 1988); *Whorton v. Dillingham,* 248 Cal.Rptr. 405, 202 Cal.App.3d 447 (1988); *E.O.C. Ord, Inc. v. Kovakovich,* 246 Cal.Rptr. 456, 200 Cal.App.3d 1194 (1988); *Farmers National Bank v. Wickham Pipeline Construction,* 114 Idaho 565, 759 P.2d 71 (1988); *Welty v. Western*

*Bank of Las Cruces,* 106 N.M. 126, 740 P.2d 120 (1987); *Koulis v. Standard Oil Company of California,* 746 P.2d 1182 (Utah App.1987); *Upland Industries Corporation v. Pacific Gamble Robinson Company,* 684 P.2d 638 (Utah 1984). There are some limited exceptions to that general rule. One of those is the invocation of a discovery rule when the fact of the breach may occur in secret, and the information is not available to the other party to the contract. *April Enterprises, Inc. v. KTTV,* 195 Cal.Rptr. 421, 147 Cal. App.3d 805 (1983). See *Yingling v. Phillips,* 65 Md.App. 451, 501 A.2d 87 (1985). But see *State v. Holland Plastics Company,* 111 Wis.2d 497, 331 N.W.2d 320 (1983) (discovery rule not applicable in contract suit). The other exception is found in those instances in which there has occurred a fraudulent concealment of the breach of contract. *L.C.L. Theatres, Inc. v. Columbia Pictures Industries, Inc.,* 566 F.2d 494 (5th Cir.1978); *Atlantic Richfield Company v. CRA, Inc.,* 430 F.Supp. 1299 (N.D. Tex.1975); *Frank Cooke, Inc. v. Hurwitz,* 10 Mass.App. 99, 406 N.E.2d 678 (1980). Cf. *McCloskey v. Carlton Builders,* 211 Cal.Rptr. 659, 165 Cal.App.3d 689 (1985) (fraudulent concealment applied in tort case); *Skuffeeda v. St. Vincent Hospital and Medical Center,* 77 Or.App. 477, 714 P.2d 235 (1986) (fraudulent concealment in medical malpractice suit). The facts of this case do not adapt to either of these exceptions.

I would apply the statute of limitations found in § 1–3–105, W.S.1977. There is no question that, if a breach of the Wolf Agreement occurred, it happened on May 11, 1973. The cause of action accrued more than ten years before the complaint was filed, and the district court correctly determined that it was barred by the statute of limitations. The action being barred by the statute of limitations, there is no necessity for invoking the doctrine of laches, and my view is that reliance upon the doctrine of laches when the statute of limitations governs the disposition of a case undermines the efficacy of the statute of limitations. We should refrain from doing that as a matter of judicial restraint.

I would affirm the judgment, but for the reason stated.